**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GRACETOWN, INC.,

                        Plaintiff,

    -against-

UNITED STATES DEPARTMENT OF THE
TREASURY, OFFICE OF FOREIGN
ASSETS CONTROL *et al.*,

                    Defendants.

No. 26 Civ. 0257 (ER)

## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT ON COUNT ONE AND MOTION TO DISMISS THE REMAINING COUNTS

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2679

JEAN-DAVID BARNEA
Assistant United States Attorney
– Of Counsel –

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND .......................................................................................................... 3

    A.  Statutory and Regulatory Background......................................................... 3

    B.  Gracetown's Operations and Pre-Penalty Conduct...................................... 5

    C.  OFAC Designates Deripaska as an SDN and Notifies Gracetown.............. 6

    D.  Gracetown Receives Blocked Property and Belatedly Notifies OFAC......... 7

    E.  OFAC Proposes a Penalty on Gracetown .................................................. 8

    F.  OFAC Imposes a Penalty on Gracetown .................................................. 11

    G.  Gracetown Files This Lawsuit ................................................................... 13

DISCUSSION ........................................................................................................... 14

  I.  The Government Is Entitled to Summary Judgment on Gracetown's Claim that the Penalty Is Arbitrary and Capricious or an Abuse of Discretion ....................................... 14

    A.  Standard of Review..................................................................................... 14

    B.  The Penalty Is Not Arbitrary, Capricious, or an Abuse of Discretion........ 17

  II.  The Court Should Dismiss Gracetown's Remaining Claims............................ 21

    A.  Standard of Review..................................................................................... 20

    B.  Due Process Does Not Require an ALJ Hearing Before Imposing OFAC Penalties ............................................................................................. 21

    C.  OFAC's Decision to Penalize Gracetown Is Not Unconstitutional National-Orgin Discrimination ....................................................................................... 25

    D.  The OFAC Penalty Against Gracetown Is Not an Unconstitutionally Excessive Fine ...................................................................................................... 27

    E.  Congress Constitutionally Authorized OFAC to Adjudicate IEEPA Violations and Impose Money Penalties ..................................................................... 30

CONCLUSION........................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

***Cases***

*Al-Aqeel v. Paulson*,
  568 F. Supp. 2d 64 (D.D.C. 2008) ............................................................................ 22

*Aleutian Cap. Partners, LLC v. Scalia*,
  975 F.3d 220 (2d Cir. 2020) ..................................................................................... 14

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................................... 14

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) .................................................................................................. 33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................. 21

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,
  462 U.S. 87 (1983) .................................................................................................... 16

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................. 21

*Bellevue Hosp. Ctr. v. Leavitt*,
  443 F.3d 163 (2d Cir. 2006) .................................................................... 15, 16, 18, 20

*Bowman Transp., Inc. v. Ark.-Best Freight Sys. Inc.*,
  419 U.S. 281 (1974) .................................................................................................. 16

*Camp v. Pitts*,
  411 U.S. 138 (1973) .................................................................................................. 17

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .................................................................................................. 15

*Clifford v. U.S. Coast Guard*,
  915 F. Supp. 2d 299 (E.D.N.Y. 2013) ............................................................... 14, 15

*Combat Veterans for Cong. Pol. Action Comm. v. Fed. Election Comm'n*,
  983 F. Supp. 2d 1 (D.D.C. 2013) ............................................................................. 28

*Crowell v. Benson*,
  285 U.S. 22 (1932) .............................................................................................. 31, 33

*Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*,
    606 F. Supp. 2d 59 (D.D.C. 2009) ................................................................................... 22

*Envtl. Def. v. EPA*,
    369 F.3d 193 (2d Cir. 2004) ............................................................................................ 15

*Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury*,
    168 F. Supp. 3d 131 (D.D.C. 2016) ................................................................................ 30

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000) .............................................................................................. 26

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) .......................................................................................................... 30

*Grid Radio v. FCC*,
    278 F.3d 1314 (D.C. Cir. 2002) ...................................................................................... 28

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ........................................................................................................ 16

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................................................ 16

*In re N.Y. Trap Rock Corp.*,
    42 F.3d 747 (2d Cir. 1994) .............................................................................................. 34

*Interior Glass Sys., Inc. v. United States*,
    927 F.3d 1081 (9th Cir. 2019) ........................................................................................ 24

*Int'l Fabricare Inst. v. EPA*,
    972 F.2d 384 (D.C. Cir. 1992) ........................................................................................ 15

*Islamic Am. Relief Agency v. Unidentified FBI Agents*,
    394 F. Supp. 2d 34 (D.D.C. 2005) .................................................................................. 16

*Karpova v. Snow*,
    402 F. Supp. 2d 459 (S.D.N.Y. 2005) ....................................................................... 16, 20

*Karpova v. Snow*,
    497 F.3d 262 (2d Cir. 2007) ............................................................................................ 33

*Marsh v. Ore. Natural Res. Council*,
    490 U.S. 360 (1989) ........................................................................................................ 15

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..................................................................................................... 23

*Micei Int'l v. Dep't of Commerce*,
    613 F.3d 1147 (D.C. Cir. 2010) ................................................................................... 24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)....................................................................................................... 16

*N.Y. Legal Assistance Group v. DeVos*,
    527 F. Supp. 3d 593 (S.D.N.Y. 2021)......................................................................... 14

*Oceanic Steam Navigation Co. v. Stranahan*,
    214 U.S. 320 (1909)............................................................................................... 32, 33

*Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*,
    584 U.S. 325 (2018)..................................................................................................... 31

*Regan v. Wald*,
    468 U.S. 222 (1984)..................................................................................................... 16

*Sanders v. Szubin*,
    828 F. Supp. 2d 542 (E.D.N.Y. 2011) ........................................................................ 30

*SEC v. Jarkesy*,
    603 U.S. 109 (2024)............................................................................... 30, 31, 33, 34

*Seife v. U.S. Dep't of Health & Human Servs.*,
    440 F. Supp. 3d 254 (S.D.N.Y. 2020)......................................................................... 15

*Sligo Creek Ctr. v. U.S. Dep't of Health & Human Servs.*,
    177 F.4th 556 (4th Cir. 2026) ..................................................................................... 34

*Teleanu v. Koumans*,
    480 F. Supp. 3d 567 (S.D.N.Y. 2020)......................................................................... 15

*United States v. Bajakajian*,
    524 U.S. 321 (1998)......................................................................................... 28, 29, 30

*United States v. Dist. Council of N.Y.C.*,
    311 F. Supp. 3d 638 (S.D.N.Y. 2018)......................................................................... 15

*United States v. Schwarzbaum*,
    127 F.4th 259 (11th Cir. 2025) ................................................................................... 29

*United States v. Viloski,*
   814 F.3d 104 (2d Cir. 2016)..................................................................... 28, 29

*Whiteside v. Hover-Davis, Inc.,*
   995 F.3d 315 (2d Cir. 2021)........................................................................ 21

*Zevallos v. Obama,*
   793 F.3d 106 (D.C. Cir. 2015)..................................................................... 22

**Statutes**

5 U.S.C. §§ 554-557 ........................................................................................ 21

   5 U.S.C. § 554(a) ......................................................................................... 22

Administrative Procedure Act,
   5 U.S.C. § 701 *et seq.*................................................................................... 1

   5 U.S.C. § 706............................................................................................... 17

   5 U.S.C. § 706(2) ......................................................................................... 15

   5 U.S.C. § 706(2)(A)..................................................................................... 15

Cuban Democracy Act of 1992,
   Pub. L. No. 102-484, tit. XVII, § 1710(c)(2), 106 Stat. 2580 ................... 21

Federal Civil Penalties Inflation Adjustment Act of 1990,
   28 U.S.C. § 2461 note............................................................................... 3, 27

Foreign Narcotics Kingpin Designation Act,
   21 U.S.C. § 1901 *et seq.*.............................................................................. 22

International Emergency Economic Powers Act,
   50 U.S.C. § 1701 *et seq.*............................................................................... 3

   50 U.S.C. § 1701............................................................................................. 3

   50 U.S.C. § 1701(a) .................................................................................. 32, 33

   50 U.S.C. § 1702(a)(1)(B) ......................................................................... 3, 32

   50 U.S.C. § 1705(a) ..................................................................................... 32

   50 U.S.C. § 1705(a) (1977)........................................................................... 27

   50 U.S.C. § 1705(a) (2006)........................................................................... 27

   50 U.S.C. § 1705(a), (b) (1996).................................................................... 27

50 U.S.C. § 1705(b) (2007) .......................................................................................... 27

50 U.S.C. § 1705(b) ................................................................................................ 3, 32

Trading With the Enemy Act,
50 U.S.C. §§ 4301-4341 .............................................................................................. 21

50 U.S.C. § 4315(b)(3) ................................................................................................ 21

*Regulations and Administrative Materials*

Reporting, Procedures and Penalties Regulations,
31 C.F.R. part 501 ........................................................................................................ 5

31 C.F.R. § 501.603(a)(1) ............................................................................................. 5

31 C.F.R. § 501.603(b)(1)(i) .......................................................................................... 5

Economic Sanctions Enforcement Guidelines, 31 C.F.R. part 501 app. A ...................... *passim*

Ukraine-/Russia-Related Sanctions Regulations,
31 C.F.R. part 589 ...................................................................................................... 4

31 C.F.R. § 589.201(a)(3) .................................................................................... 4, 29, 32

31 C.F.R. § 589.201(a)(4) ..................................................................................... 29, 32

31 C.F.R. § 589.201(b)(1) ............................................................................................. 4

31 C.F.R. § 589.701(a) ............................................................................................. 4, 29

31 C.F.R. § 589.702(a) ................................................................................................. 4

31 C.F.R. § 589.703 ................................................................................................ 4, 24

31 C.F.R. § 589.802 ..................................................................................................... 4

U.S. Dep't of Treasury, Off. of Foreign Assets Control,
*Inflation Adjustment of Civil Monetary Penalties*, 89 Fed. Reg. 2139 (Jan. 12, 2024) ........ 3, 27

U.S. Dep't of Treasury, Off. of Foreign Assets Control,
*Foreign Assets Control Regulations; Regulations Prohibiting Transactions Involving the Shipment of Certain Merchandise Between Foreign Countries; Cuban Assets Control Regulations: Civil Penalty Administrative Hearings*, 62 Fed. Reg. 6896 (Feb. 14, 1997) ......22

*Executive Orders and Legislative Materials*

Executive Order No. 13,660,
79 Fed. Reg. 13,493 (Mar. 10, 2014)........................................................................ 3, 32

Executive Order No. 13,661,
  79 Fed. Reg. 15,535 (Mar. 19, 2014) .................................................................... 3, 4, 6, 32

Executive Order No. 13,662,
  79 Fed. Reg. 16,169 (Mar. 24, 2014) .................................................................... 3, 4, 6, 32

*Consideration of the Cuban Democracy Act of 1992: Hearings and Markup Before the H.
  Comm. on Foreign Affairs*, 102nd Cong., 2d Sess. (1992) ......................................... 23

*Enforcement of Penalties Against Violations of the U.S. Embargo on Cuba: Hearing Before
  the Subcomm. on the W. Hemisphere of the H. Comm. on Int'l Relations*,
  104th Cong., 2d Sess.  (Mar. 5, 1996) ................................................................... 22

### Rules

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 21

Fed. R. Civ. P. 25(d) ........................................................................................................... 1

Fed. R. Civ. P. 56 .............................................................................................................. 14

Defendants the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"); Scott K. Bessent, Secretary, U.S. Department of the Treasury, in his official capacity; Bradley T. Smith, Director of OFAC, in his official capacity; the U.S. Department of Justice; and Todd Blanche, the Acting Attorney General,[1] in his official capacity (collectively, the "Government"), by their attorney, Jay Clayton, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in response to the Complaint, ECF No. 1 ("Compl."), filed by plaintiff Gracetown, Inc. ("Gracetown"), which challenges OFAC's imposition of a sanctions penalty on various grounds. For the reasons stated herein, the Court should grant the Government summary judgment on the first count of the Complaint, which asserts that the agency's imposition of the penalty was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and dismiss the remaining counts.

## PRELIMINARY STATEMENT

In 2025, OFAC imposed an approximately $7 million penalty on Gracetown for knowingly receiving numerous payments over more than two years on behalf of Baufinanz Investments Limited ("Baufinanz"), an entity owned by a sanctioned Russian oligarch, Oleg Deripaska. Gracetown had itself previously been owned by Deripaska and the two entities shared personnel and management. When OFAC designated Deripaska, it provided Gracetown written notice that any property in Gracetown's possession in which Deripaska had an interest was blocked, could not be dealt in, and had to be reported to OFAC. Gracetown failed to adhere to these instructions and received 24 payments on behalf of Baufinanz following his designation. Gracetown reported the transactions to OFAC only years later, well after the Government had already learned of them,

---

[1] Mr. Blanche is automatically substituted for his predecessor pursuant to Federal Rule of Civil Procedure 25(d).

and well after the deadline to report them had passed. OFAC investigated Gracetown's misconduct, carefully weighed all the evidence, and ultimately imposed a penalty based on the agency's enforcement guidelines.

In this lawsuit, Gracetown attacks the penalty OFAC imposed as arbitrary and capricious, in violation of the APA. But Gracetown's challenge is, in the most generous framing, simply an argument that the evidence before the agency was susceptible to different conclusions. OFAC's considered decision, based on its view of the record and the applicable guidelines, falls well within the agency's discretion and cannot be disturbed on APA review. The Court should thus grant the Government summary judgment on this claim.

Gracetown also raises several constitutional and other challenges to OFAC's decision—which all lack merit. Gracetown argues that OFAC should not have imposed the penalty in question without a finding by an administrative law judge, citing a different (but inapplicable) sanctions statute that requires this procedure. But Congress's decision to vary administrative procedures between statutes is not a procedural due process violation where each statute has sufficient procedural protections. Nor did OFAC treat Gracetown more harshly based on its owners' national origin. OFAC's decision as to the penalty amount—including its decision not to afford Gracetown a "first violation" reduction—was supported by the record and was not the product of unconstitutional national-origin discrimination. Furthermore, the penalty at issue, though much larger than the amount of the underlying illegal transactions, is not an unconstitutional "excessive fine"; it incorporates a 20% reduction from the statutory maximum for the principal penalty and was carefully calculated based on the agency's well-established methodology. And finally, the statute that allows OFAC to impose the penalties at issue does not violate Gracetown's constitutional right to a jury trial, as such trials are not required where

2

Congress has permissibly assigned to the Executive Branch the authority to adjudicate matters involving "public rights" in such areas as foreign commerce, foreign affairs, and national security. The Court should thus dismiss Gracetown's remaining claims.

## BACKGROUND

### A. Statutory and Regulatory Background

The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, grants the President the authority to deal with unusual and extraordinary foreign threats to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such a threat. *See id.* § 1701. Once such a national emergency is declared, the President may "direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). IEEPA authorizes the imposition of civil monetary penalties for violations, in the greater of $250,000 or twice the amount of the violative transaction. *See id.* § 1705(b). As of the relevant date for this case, the $250,000 maximum penalty had been adjusted to $368,136 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note. *See* U.S. Dep't of Treasury, Off. of Foreign Assets Control, *Inflation Adjustment of Civil Monetary Penalties*, 89 Fed. Reg. 2139, 2139 tbl.1 (Jan. 12, 2024).

***Ukraine-/Russia-Related Sanctions Regulations ("URSR").*** On March 6, 2014, the President signed Executive Order 13,660, 79 Fed. Reg. 13,493 (Mar. 10, 2014), invoking IEEPA to declare a national emergency with respect to Ukraine. On March 16 and 20, 2014, the President signed Executive Orders 13,661, 79 Fed. Reg. 15,535 (Mar. 19, 2014), and 13,662, 79 Fed. Reg. 16,169 (Mar. 24, 2014), which expanded the scope of that national emergency and discussed the

3

role of the Russian government in creating the situation in Ukraine. The President further expanded the scope of the national emergency in subsequent Executive Orders and took additional steps with respect to this national emergency. These orders authorize the Secretary of the Treasury, in consultation with the Secretary of State, to designate persons who meet certain criteria and block their property and interests in property within the United States. *See* Exec. Order No. 13,661, § 1(a); Exec. Order No. 13,662, § 1(a). The orders also authorize the Secretary of the Treasury, in consultation with the Secretary of State, to take such actions, including promulgating rules and regulations, and to employ all powers granted to the President by IEEPA, as may be necessary to carry out the purposes of the orders. *See* Exec. Order No. 13,661, § 8; Exec. Order No. 13,662, § 8. The Secretary of the Treasury's authority in this regard has been re-delegated to OFAC. 31 C.F.R. § 589.802.

On May 8, 2014, OFAC promulgated the Ukraine-/Russia-Related Sanctions Regulations, 31 C.F.R. part 589, to implement these Executive Orders; the agency re-issued and expanded the regulations in 2022. The regulations direct that all property and interests in property of any designated person that is within the United States or in the possession or within the control of any U.S. person are blocked, *see id.* § 589.201(a)(3), and that U.S. persons may not provide any funds, goods, or services to or for the benefit of any designated persons, *see id.* § 589.201(b)(1). The regulations also indicate that violations of these prohibitions are subject to civil penalties under IEEPA. *See id.* § 589.701(a).

Before imposing such a penalty, OFAC first issues the violator a pre-penalty notice, *see id.* § 589.702(a), and after considering any written response, may issue a penalty notice containing a determination of the violation and the amount of the monetary penalty, *see id.* § 589.703. OFAC determines whether to impose such penalties and the amount thereof based on its "Economic

4

Sanctions Enforcement Guidelines" (the "Enforcement Guidelines"), which are published in Appendix A to 31 C.F.R. part 501. *See id.*[2] These guidelines provide a general framework for the enforcement of all economic sanctions programs administered by OFAC. They include General Factors for OFAC to consider in determining whether a person's conduct warrants imposition of a penalty (in Section III), and for determining the amount of such a penalty (in Sections IV-V).

***Reporting, Procedures and Penalties Regulations ("RPPR").*** OFAC has also promulgated regulations setting forth reporting and recordkeeping requirements and other procedures governing transactions regulated pursuant to OFAC sanctions programs, including the URSR. *See* 31 C.F.R. part 501. Among other things, these regulations require U.S. persons holding blocked property, including property blocked pursuant to the URSR, to submit a report to OFAC within ten business days from the date that such property becomes blocked. *Id.* § 501.603(a)(1), (b)(1)(i). At the relevant time, the Enforcement Guidelines prescribed a civil monetary penalty of up to $7,104 for filing a report more than 30 days after it is due, and if the report relates to blocked assets, an additional $1,422 for every 30 days the report is overdue, for up to five years. *See* Enforcement Guidelines § IV(B).

## B. Gracetown's Operations and Pre-Penalty Conduct

Gracetown is a New York-based property-management company that was incorporated in Delaware in 2006. (Administrative Record ("AR") 33, 56-57.)[3] Gracetown's limited corporate

---

[2] A copy of the version of the Enforcement Guidelines in effect at the time of OFAC's decision is attached hereto for the Court's convenience. All citations herein are to that version unless otherwise specified.

[3] The two principal documents in the administrative record are the pre-penalty notice and the penalty notice that OFAC sent to Gracetown. Two versions of each of these documents are included: the actual notices OFAC sent (AR2-9, 21-30) and "internal" versions of these documents that include footnotes citing the materials OFAC relied upon to support its findings (AR11-19, 32-44). This memorandum cites the versions with the internal footnotes to enable the Court and Gracetown to more easily locate and review the materials underlying the agency's determinations.

purpose is to provide services needed to maintain three luxury real estate properties in the United States that were purchased by Russian oligarch Oleg Deripaska in 2006 and 2008.  (AR33, 555.) Deripaska was the ultimate beneficial owner of Gracetown from 2006 until 2018.  (AR33-34, 543.) In reliance on representations made in Gracetown's submissions, OFAC treated the ultimate beneficial ownership of Gracetown as having been transferred from Deripaska to his relative and known associate, Pavel Ezubov, in 2018.  (AR34 & nn.15, 17; AR51, 543.)  At all relevant times, Gracetown's property manager (and one of its two directors) was Quinn Bencivenga, a U.S. person.  (AR34, 53.)

In late 2013, Gracetown began collecting payments on behalf of Baufinanz, a corporate affiliate based in the British Virgin Islands that was also owned by Deripaska.  (AR34-35, 543.) Specifically, Gracetown began receiving monthly payments of $1,250 (set to total $105,000) on behalf of Baufinanz from a U.S. person pursuant to a settlement agreement.  (*Id.*)  Gracetown's property manager Bencivenga was listed as *Baufinanz's* point of contact on the settlement agreement.  (AR35, 63.)  Ezubov had been involved in managing Baufinanz's loan to the U.S. person that gave rise to the settlement agreement.  (AR35, 760-61.)  Ezubov, who worked for Deripaska, instructed Gracetown to use the settlement payments to pay Gracetown's current expenses, and to treat the payments for accounting purposes as a loan from Baufinanz.  (AR35, 67, 71.)  Ezubov relayed these instructions via an employee at another Deripaska-related business. (*Id.*)

As of April 2018, Gracetown had received $72,500 on behalf of Baufinanz pursuant to this arrangement.  (AR35, 553.)

### C.  OFAC Designates Deripaska as an SDN and Notifies Gracetown

On April 6, 2018, OFAC designated Deripaska pursuant to Executive Order 13,661 for acting on behalf of a senior Russian government official, as well as pursuant to Executive Order

6

13,662 for operating in the Russian energy sector, and added him to the Specially Designated Nationals and Blocked Persons List as an "SDN." (AR36, 813-19.) Consequently, all of Deripaska's property and interests in property (including Baufinanz) in the United States or in the possession or control of any U.S. person became blocked. (AR36, 819.) Additionally, as a result of OFAC's designation, all transactions by U.S. persons or within (or transiting) the United States involving Deripaska's property or interests in property, including transactions involving Baufinanz, became prohibited without express OFAC authorization. (*Id.*)

On the same day that OFAC designated Deripaska as an SDN, it sent a notice of the designation to Gracetown. (AR36, 821.) The notice informed Gracetown of its obligations to block and report Deripaska's property in light of the designation. (AR36, 821-22.) Specifically, the notice stated that "[a]ny contract or written agreement between Gracetown, Inc. and Deripaska or any other designated or blocked person, as well as any payments due to . . . Gracetown, Inc. as a result of services provided under such contract or agreement, is blocked and may not be dealt in without authorization from OFAC." (AR36, 822.) Additionally, the notification informed Gracetown of its obligation to report to OFAC within ten days any blocked property or interests in property in its possession. (*Id.*) The notification emphasized that unauthorized transactions in blocked property may result in a civil monetary penalty. (AR36, 822-23.)

### D. Gracetown Receives Blocked Property and Belatedly Notifies OFAC

After receiving the OFAC notice, Gracetown continued accepting the monthly payments on behalf of Baufinanz (which continued to be ultimately beneficially owned by Deripaska) and did not report them to OFAC as required. (AR37, 553-54.) From April 2018 to May 2020, Gracetown received 24 violative payments totaling $31,250. (AR37, 44.) Consistent with Ezubov's instructions, Gracetown spent this money on its own expenses and accounted for it as a debt to Baufinanz. (AR37, 67, 71, 544.)

7

Despite its obligation to report any blocked property to OFAC within ten days of receipt, Gracetown notified OFAC of these transactions only on January 11, 2022, nearly four years after it had received the first blocked payment. (AR37, 542-46.) Although it had received written notice from OFAC of Deripaska's designation in April 2018, Gracetown's submission to OFAC incorrectly claimed that the company had "received no prior notice suggesting that the accumulation of debt to Baufinanz might constitute a violation of U.S. law." (AR37, 545.)

By the time Gracetown notified OFAC of these payments, the Government had already learned of the arrangement with Baufinanz from another source. (AR33 n.3.) Specifically, the Federal Bureau of Investigation ("FBI") learned of the payments that Gracetown was receiving on behalf of Baufinanz—more than a year before Gracetown's disclosure—in a November 2020 interview with the U.S. person who had been making those payments to repay a loan he had taken out from Baufinanz after meeting with Deripaska and Ezubov. (AR33 n.3, 757-62.)

### E. OFAC Proposes a Penalty on Gracetown

On October 8, 2024, OFAC issued a pre-penalty notice to Gracetown, proposing a penalty of $8,022,832 for Gracetown's failure to block and report the payments at issue. (AR21, 32.) To arrive at this figure, the agency first calculated the maximum possible statutory penalty. (AR37-38.) For the failure to block the payments, as mentioned above, IEEPA imposes a maximum penalty for each violative transaction of the greater of twice the amount of the transaction or $368,136. (AR37.) Because there were 24 violative transactions, the maximum penalty for Gracetown's failure to block the payments at issue was 24 times $368,136, or $8,835,264. (AR38.) As for Gracetown's failure to report the blocked transactions, the Enforcement Guidelines prescribed at the time a civil monetary penalty of up to $7,104 for filing a report more than 30 days after it is due, and an additional $1,422 for every further 30 days the report is overdue, for up to five years, if the report relates to blocked assets (as was the case here). (*Id.*) Gracetown was thus

8

liable for a potential statutory maximum failure-to-report penalty under the RPPR of $71,094—

and together with the failure-to-block URSR penalty, for a total potential maximum penalty of

$8,906,358. (AR38.)

OFAC then had to ascertain the "base penalty" for Gracetown's URSR violations, which

depended on the agency's determination of whether the conduct had been voluntarily self-

disclosed and whether it was "egregious" based on the evaluation of several factors specified in

the Enforcement Guidelines. (*Id.*); *see* Enforcement Guidelines § V(B)(2)(a); *see also id.* § III

(listing the "General Factors" OFAC considers in this analysis). OFAC found that there was no

voluntary self-disclosure here because "another federal agency[] [had] learned about Gracetown's

substantially similar apparent violations before Gracetown submitted a disclosure." (AR38.)[4]

OFAC also concluded that the conduct was egregious, based on Gracetown's willful or reckless

state of mind, its awareness of the misconduct, and other factors. (*Id.*); *see also* Enforcement

Guidelines § V(B)(1). As a result, the base penalty was equal to the maximum statutory penalty.

(AR38); *see also* Enforcement Guidelines § V(B)(2)(a)(iv).

Next, OFAC considered whether the URSR base penalty should be adjusted based on

further weighing of several aggravating and mitigating General Factors listed in Section III of the

Enforcement Guidelines. (AR38-40); *see also* Enforcement Guidelines § V(B)(2)(b):

*Aggravating Factors:*

- *Willful or Recklessness Violation of Law* (General Factor A): Gracetown's violation
  was willful because the company had received actual written notice of Deripaska's

---

[4] *See* Enforcement Guidelines § I(I) ("Voluntary self-disclosure means self-initiated notification
to OFAC of an apparent violation by a Subject Person that has committed, or otherwise participated
in, an apparent violation of a statute, Executive order, or regulation administered or enforced by
OFAC, *prior to or at the same time that OFAC, or any other federal, state, or local government
agency or official, discovers the apparent violation or another substantially similar apparent
violation.*" (emphasis added)).

designation but continued to deal in Baufinanz's (and thus Deripaska's) property, thus improperly providing him access to U.S. financial services.  (AR39.)

- *Awareness of Conduct at Issue* (General Factor B): Gracetown knew of its misconduct because it knew that Deripaska owned Baufinanz, and that it was receiving payments on behalf of Baufinanz.  Gracetown's director and property manager (Bencivenga) was listed as Baufinanz's point of contact on the settlement agreement pursuant to which the payments were made.  (*Id.*)

- *Harm to Sanctions Program Activities* (General Factor C): Gracetown acted contrary to U.S. foreign policy interests by dealing in a sanctioned oligarch's property in the United States and by providing Baufinanz (a blocked entity) access to U.S. financial services.  (*Id.*)

- *Remedial Response* (General Factor F): Gracetown failed to block and timely report the transactions at issue despite receiving actual notice from OFAC of Deripaska's designation.  Gracetown claimed in its submission to OFAC that the notice did not specifically inform it that dealings with Baufinanz were prohibited, but this is not credible because Gracetown knew that Deripaska owned Baufinanz.  OFAC thus concluded that Gracetown "failed to discover necessary information to ascertain the causes and extent" of its violations and that Gracetown's response was thus grossly inadequate.  (AR39-40.)

*Mitigating Factors:*

- *Cooperation with OFAC* (General Factor G): Gracetown signed a tolling agreement with OFAC and provided information to the agency in response to its requests.  (AR40.)

Finally, OFAC considered whether Gracetown should receive a discretionary "mitigation credit" for a "first violation" given that the agency had not penalized it at least in the past five years.  (AR41.); *see also* Enforcement Guidelines § V(B)(2)(b)(ii).  OFAC decided against awarding this credit based on several considerations: (i) Gracetown was previously owned by Deripaska, a sanctioned Russian oligarch; (ii) Gracetown's owner Ezubov represented Baufinanz at the time of the settlement agreement; (iii) Gracetown's property manager was Baufinanz's point of contact for the settlement agreement; and (iv) OFAC had reason to believe that Gracetown had received significant sums of money from persons connected to Deripaska after he was designated as an SDN, which were used to maintain the properties Gracetown managed—thus suggesting that

10

Gracetown "is part of a broader network of actors working for or on behalf of [Deripaska] and his interests in property." (AR40-41 & nn.63-64, 807-09.)

Considering all of these factors together, OFAC decided to reduce by 10% the proposed failure-to-block URSR penalty, and (in addition to the failure-to-report RPPR penalty) proposed an overall penalty of $8,022,832. (AR41.) The agency invited Gracetown to submit a written response to the pre-penalty notice. (AR41-42.)

### F. OFAC Imposes a Penalty on Gracetown

In response to the pre-penalty notice, Gracetown submitted several letters and other materials to OFAC and offered to settle the matter for $20,000. (AR11, 712-38.) In Gracetown's view, its behavior was not egregious and it was entitled to significant mitigation based on the Enforcement Guidelines factors. (AR11, 725-28.) Gracetown also argued that it should not have to pay the RPPR failure-to-report penalty. (AR11, 714.) As a result of these arguments, OFAC reduced the URSR failure-to-block penalty proposed in the pre-penalty notice by 20% (rather than 10%), resulting in a final penalty of $7,139,305. (AR12.)

To reach this decision, OFAC responded to the objections Gracetown raised to the agency's conclusions in the pre-penalty notice. (AR11-12). OFAC first considered and rejected several arguments as to why Gracetown's actions should not be considered egregious, but "at worst, negligent" (AR12-16):

- Gracetown argued that OFAC had "overstate[d] the impact" that receiving the blocking notice as to Deripaska would have had, and claimed that Gracetown simply "failed to recognize the connection" between the transactions at issue and the Deripaska notice. (AR12, 731-32.) But OFAC noted that Gracetown indisputably knew that Deripaska was Baufinanz's ultimate beneficial owner given the two companies' close corporate relationship and overlapping personnel (including Bencivenga, who served as both Gracetown's property manager/director and Baufinanz's point of contact for the settlement agreement). (AR12, 542.) Given this, OFAC concluded that its notice should have reasonably alerted Gracetown that transactions on behalf of Baufinanz would have to be blocked. (AR12-13.)

11

- Gracetown next claimed that its misconduct was not willful or reckless because the relevant settlement agreement was executed before Deripaska had been designated, and Gracetown's management was unaware of the agreement's contents (which did not mention Deripaska by name) until May 2020. (AR13, 732.) But OFAC concluded that Gracetown's conduct was indeed willful or reckless given its receipt of the designation notice, its overlapping ownership and management with Baufinanz, and the personal knowledge of Ezubov and Bencivenga. (AR13-14.)

- Gracetown further argued that its misconduct did not cause meaningful harm to the sanctions program because the amount of money involved was relatively low and the funds at issue did not benefit sanctioned parties. (AR14, 734.) OFAC explained that while it did consider the value of the transactions as a factor in deciding on the penalty, this factor was outweighed by other factors, such as the prolonged duration of the violation after Gracetown received the notice of designation. The agency also noted that, through these transactions, Gracetown transacted in the property of a blocked entity (Baufinanz) and allowed one of its debts to become settled. (AR15.)

- Finally, Gracetown asserted that its actions should not be considered egregious because it was no longer an operational entity and had no funding or employees, citing a published OFAC settlement with a different company. (AR15, 731-32.) But OFAC found Gracetown's misconduct egregious because it was repeated and prolonged—which was particularly salient given that Gracetown should have understood it was at a high risk of sanctions violations given its ownership and corporate relationships. (AR15 & n.38.) OFAC distinguished its other settlement, which was with a large multinational company that underwent a change in corporate ownership and added a sanctions compliance policy as part of the settlement. (AR16.)

OFAC also explained why it disagreed with Gracetown's several suggestions that it was

entitled to a substantial reduction of the penalty proposed in the pre-penalty notice (AR16-18):

- Gracetown argued for a substantial cooperation credit or voluntary self-disclosure credit due to its belated disclosure and blocking efforts and its responses to OFAC's requests for information. (AR16, 736.) But OFAC noted that Gracetown's disclosure and action came only after the Government had learned of the misconduct through an FBI interview, and after vendors began treating the properties that Gracetown managed as blocked following the FBI's search of them as part of a criminal investigation into Deripaska. (AR16 & n.44.) OFAC also explained that Gracetown's cooperation with the investigation was far from exemplary and included unnecessary delays and erroneous assertions that requested information did not exist. (AR16 & n.46.) Nonetheless, specifically relying on Gracetown's cooperation during the investigation, OFAC decided to provide a mitigation credit of 20% on the failure-to-block URSR penalty, rather than the 10% proposed credit in the pre-penalty notice. (AR17.)

- Gracetown also suggested it should get a "first violation" mitigation credit, because OFAC should not have treated the Deripaska blocking notice as a prior "enforcement action" that rendered Gracetown ineligible for the mitigation credit. (*Id.*) But OFAC

12

explained that its decision not to award a "first violation" credit was not because the blocking notice was considered an enforcement action. Instead, the agency explained that it denied the discretionary mitigation credit because of Gracetown's willful violation after receiving notice of Deripaska's designation, and because the credit would not promote future compliance given Gracetown's assertion that it is defunct. (*Id.*)

- Relatedly, Gracetown argued that because it was a non-operational entity, it should be entitled to mitigation under General Factor J (Future Compliance/Deterrence Effect), *see* Enforcement Guidelines § III(J), which takes into account the impact of an OFAC action "on promoting future compliance with U.S. economic sanctions" by the penalized party or similar parties. (AR17, 736.) OFAC concluded that penalizing Gracetown would in fact strengthen future compliance for entities that, like Gracetown, are at high risk of sanctions violations due to their ownership structure, by giving them a stronger incentive to look out for and report potential violations. (AR17-18.)

Finally, OFAC rejected Gracetown's assertion that the failure-to-report RPPR penalty was disproportionately harsh because companies subject to this type of penalty are typically sophisticated financial institutions and because the penalty imposed on Gracetown exceeded one the agency had previously imposed on a large bank. (AR18.) In response, OFAC explained that these penalties apply to everyone, not just sophisticated financial institutions, and appropriately accounted for the fact that Gracetown's disclosure was 45 months late. (*Id.*) As for the other penalty Gracetown discussed (on the large bank), it was part of a settlement agreement (unlike the penalty imposed on Gracetown) and was the product of the lower inflation-adjusted penalty amounts in place back in 2014. (*Id.*) OFAC noted that the bank did not receive any mitigation credit in connection with its RPPR violations as part of its settlement with OFAC. (*Id.*)

Thus, through its detailed review and consideration of Gracetown's arguments, OFAC decided to reduce its proposed failure-to-block URSR penalty by 20% (rather than the initial 10%)—which, added to the unchanged failure-to-report RPPR penalty, resulted in a final penalty amount of $7,139,305—to account for Gracetown's cooperation in the investigation. (*Id.*)

13

### G. Gracetown Files This Lawsuit

On January 12, 2026, Gracetown filed the instant lawsuit challenging the final OFAC penalty. The complaint asserts five claims: (1) that OFAC acted arbitrarily and capriciously, or abused its discretion, in violation of the APA, in imposing the penalty at issue, *see* Compl. ¶ 61; (2) that OFAC ran afoul of the Fifth Amendment's Due Process Clause and thus the APA in not offering Gracetown a hearing before an Administrative Law Judge ("ALJ") before imposing the proposed penalty, *see id.* ¶ 63; (3) that OFAC ran afoul of the Fifth Amendment's equal protection component and thus the APA in discriminating against Gracetown based on its owners' national origin, *see id.* ¶ 65; (4) that the penalty violates the Eighth Amendment's Excessive Fines Clause because it is more than 200 times larger than the underlying sanctions-violative payments, *see id.* ¶ 67; and (5) that the penalty violates Gracetown's right to a jury trial under the Seventh Amendment because it is analogous to claims that were traditionally tried in Article III courts but was imposed by an administrative agency without a trial, *see id.* ¶ 69.

The Government answered the complaint on March 30, ECF No. 28, and the Court thereafter set a combined briefing schedule for the Government's motion to dismiss and the parties' cross-motions for summary judgment, as well as for filing the administrative record, ECF Nos. 38, 40.

## DISCUSSION

### I. The Government Is Entitled to Summary Judgment on Gracetown's Claim that the Penalty Is Arbitrary and Capricious or an Abuse of Discretion

#### A. Standard of Review

Ordinarily, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a party challenges agency action under the APA, the district court acts as an "appellate

tribunal" and the case on review presents "a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see, e.g.*, *N.Y. Legal Assistance Group v. DeVos*, 527 F. Supp. 3d 593, 599 (S.D.N.Y. 2021). Summary judgment is generally the appropriate procedural vehicle to resolve an APA case, *see Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020); *Clifford v. U.S. Coast Guard*, 915 F. Supp. 2d 299, 307 (E.D.N.Y. 2013) ("[T]he Second Circuit has allowed appeals of agency decisions to be styled as motions for summary judgment . . . ."), but "the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply," *Seife v. U.S. Dep't of Health & Human Servs.*, 440 F. Supp. 3d 254, 271 (S.D.N.Y. 2020) (citation omitted).[5] Instead, the court decides the legal issue of whether the agency's action was arbitrary and capricious, 5 U.S.C. § 706(2)(A), by reviewing "the administrative record compiled by that agency when it made the decision," *Clifford*, 915 F. Supp. 2d at 307.

Under the APA, this Court may only hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). "Substantial evidence is more than a mere scintilla but something less than the weight of the evidence, and the substantial evidence standard may be met despite the possibility of drawing two inconsistent conclusions from the evidence." *United States v. Dist. Council of N.Y.C.*, 311 F. Supp. 3d 638, 642 (S.D.N.Y. 2018).

Review under the APA's "arbitrary and capricious" standard is "narrow and particularly deferential," requiring the agency only to demonstrate that it "has considered the evidence,

---

[5] Because the Government seeks summary judgment on the APA claims based on a certified administrative record a Rule 56.1 statement is not required. *See Teleanu v. Koumans*, 480 F. Supp. 3d 567, 575 n.11 (S.D.N.Y. 2020) ("A Rule 56.1 statement is not required in a case seeking review of an administrative action under the APA.").

examined the relevant factors, and spelled out a satisfactory rationale for its action including the demonstration of a reasoned connection between the facts it found and the choice it made." *Envtl. Def. v. EPA*, 369 F.3d 193, 201 (2d Cir. 2004); *see also, e.g.*, *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 378 (1989); *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (stating that this "highly deferential standard of review presumes 'agency action to be valid'").

Courts have "no license to substitute [their] policy judgment for that of the agency." *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 174 (2d Cir. 2006) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  Rather, the court's task is to determine whether the agency's decision is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).  To do this, courts must determine whether the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made.  *See Bowman Transp., Inc. v. Ark.-Best Freight Sys. Inc.*, 419 U.S. 281, 285-86 (1974).  The agency's decision must be respected unless "the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Bellevue Hosp.*, 443 F.3d at 174 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

This deference is further heightened in cases, such as this one, that involve national security and foreign affairs.  Such deference is required because courts should respect the Executive's expertise in the national security and foreign policy arenas.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010); *Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to

the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952))); *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 45 (D.D.C. 2005), *aff'd in part*, 477 F,3d 728 (D.C. Cir. 2007) (recognizing that the conduct of foreign relations is to be left to the political branches, and stating that "[a]s a general princip[le], . . . this Court should avoid impairment of decisions made by the Congress or the President in matters involving foreign affairs or national security" (internal quotation marks omitted)).  This heightened deference applies to OFAC civil penalty determinations.  *See, e.g.*, *Karpova v. Snow*, 402 F. Supp. 2d 459, 466 (S.D.N.Y. 2005), *aff'd*, 497 F.3d 262 (2d Cir. 2007) (applying "highly deferential standard" to OFAC civil penalty determination).

The Court's review of an agency's action under the APA is limited to the administrative record compiled by the agency.  *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

### B.  The Penalty Is Not Arbitrary, Capricious, or an Abuse of Discretion

Gracetown's arguments in its complaint as to why it believes OFAC violated the APA in imposing the penalty at issue mirror the arguments it made in response to the pre-penalty notice—which OFAC carefully reviewed and rejected in the penalty notice.  *Compare* Compl. ¶ 61(a)-(*l*), *with* (AR12-18) (summarized *supra* in Background, Section F).  Because OFAC reasonably weighed the evidence before it and reached decisions that accorded with the record and the regulatorily prescribed General Factors, there is no basis for this Court to displace the agency's determination.  While Gracetown may disagree with OFAC's determination and, in some cases, there may be evidence in the record that may support more than one possible view of the facts, that is not enough to set aside an agency's decision as arbitrary, capricious, or an abuse of discretion.  The Government is thus entitled to summary judgment on this claim.

Gracetown does not dispute the principal facts upon which OFAC based the penalty at issue: Gracetown received 24 monthly payments totaling $31,250 on behalf of Baufinanz (an entity it knew was beneficially owned by Deripaska) after OFAC designated Deripaska as an SDN and notified Gracetown that it must block any property in which he is interested and report it to the agency. (AR21-24.)  Gracetown also does not dispute that its behavior violated both the URSR for its failure to block these funds and the RPPR for its failure to timely report them, as it (much later) disclosed these violations to OFAC. (AR544-45.)

Gracetown's complaint nonetheless makes a series of arguments that essentially boil down to disagreement with the weight OFAC gave to certain relevant factors in making its discretionary decision as to how much to penalize Gracetown for its acknowledged violation.  This is precisely the type of determination that is left to an agency's discretion and cannot be second-guessed in APA litigation.  *See Bellevue Hosp.*, 443 F.3d at 174.  The Court should thus reject these arguments.

Gracetown first argues that the penalty is "excessive and bears no reasonable relationship to the alleged conduct." Compl. ¶ 61(b).  But (putting aside the question of the Eighth Amendment Excessive Fines Clause, discussed *infra* in Section II.D), the relationship between Gracetown's conduct and the amount of the penalty is clear and was explained in detail.  OFAC concluded, based on the methodology in its published Enforcement Guidelines, that Gracetown's conduct was both egregious (based on detailed consideration of prescribed General Factors) and not self-disclosed to the agency before the Government otherwise learned of the violations, resulting in a base penalty equal to the statutory maximum. (AR37-38); Enforcement Guidelines § V(B)(2)(a).  OFAC then considered, based on the same General Factors, whether the base penalty should be increased or reduced, and initially proposed a 10% discount of the principal penalty (for failure to

18

block, under URSR) based on Gracetown's cooperation and disclosure.  (AR38-41.)  After receiving and reviewing Gracetown's objections, OFAC decided to reduce this penalty by 20% in light of Gracetown's cooperation during the investigation.  (AR12-18.)  While Gracetown may have wanted OFAC to analyze the factors differently than it did, or to arrive at a larger discretionary reduction in the penalty amount, Gracetown has not identified any aspect of the agency's analysis that was arbitrary, capricious, or outside OFAC's discretion.

Gracetown next claims that its conduct was unintentional in that it only "passively" and "inadvertent[ly]" accepted payments on behalf of Baufinanz after OFAC designated Deripaska as an SDN.  Compl. ¶ 61(c).  But OFAC reasonably took a different view of the evidence before it.  It looked to the undisputed facts that Gracetown was originally beneficially owned by Deripaska who then transferred ownership to his relative and associate Ezubov a few months before the SDN designation; that Ezubov and Gracetown's property manager Bencivenga were closely involved in the settlement that gave rise to the payments at issue; that the settlement agreement identified Gracetown as the recipient of the payments due to Baufinanz; and that Gracetown received actual notice of Deripaska's designation from OFAC.  (AR12-14.)  These factors led OFAC to conclude, reasonably, that Gracetown's conduct was willful or reckless.  (*Id.*)

As for Gracetown's claim that it should have been penalized less because it "implemented remedial measures," Compl. ¶ 61(d), OFAC found these measures inadequate as they were extremely late.  (AR39.)  OFAC further found Gracetown's claim that it had "received no prior notice suggesting that the accumulation of debt to Baufinanz might constitute a violation of U.S. law" unsubstantiated in light of OFAC's 2018 notice, which should have led Gracetown to block the violative transactions given its "longstanding, direct relationship with Deripaska and ongoing dealings involving his network."  (AR 39-40.)  The fact that Gracetown did not immediately block

19

the transaction means that it "failed to discover necessary information to ascertain the causes and extent" of its violations. (AR 40.)

Gracetown further asserts that OFAC minimized the informational value of its belated self-disclosure and its subsequent cooperation to OFAC's investigation. Compl. ¶ 61(e)-(f). To the contrary, OFAC carefully weighed these factors as well, concluding that the self-disclosure was late without adequate explanation and the cooperation was at times halting and incomplete—but nonetheless affording Gracetown a substantial discount from the base penalty based on these factors. (AR16-18, 41.)

OFAC also had good reason to doubt the notion that the properties towards which Gracetown applied the loan payments were unconnected to Deripaska, *see* Compl. ¶ 61(g), given Gracetown's corporate history and overlapping personnel with Baufinanz and other Deripaska endeavors, which suggest that Gracetown "is part of a broader network of actors working for or on behalf of [Deripaska] and his interests in property." (AR26, 40-41.) OFAC considered and rejected awarding Gracetown an optional discount for being a first-time offender, *see* Compl. ¶ 61(h), for the same reasons (AR40-41, 807-09).

Gracetown is thus incorrect that OFAC's "penalty calculation departed from its . . . Enforcement Guidelines." Compl. ¶ 61(j). While Gracetown may disagree with how OFAC weighed the relevant factors, it has not come close to showing that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Bellevue Hosp.*, 443 F.3d at 174 (internal quotation marks omitted). As for Gracetown's suggestion that "OFAC's penalty appears to have been influenced, at least in part"

20

by unproven allegations in the unsealed criminal indictment against Deripaska, Compl. ¶ 61(k), Gracetown has presented no evidence for this speculation and the penalty notices do not support it. Particularly considering the "highly deferential standard" courts apply to decisions such as this one that involve national security considerations, *Karpova*, 402 F. Supp. 2d at 466, Gracetown is far from establishing that OFAC exceeded its broad discretion in imposing the penalty it did.

The Court should thus grant the Government summary judgment on Gracetown's principal APA claim.

## II.    The Court Should Dismiss Gracetown's Remaining Claims

Gracetown's complaint also includes a grab-bag of constitutional and other challenges to the OFAC penalty. These challenges are all without basis and should be rejected. The remaining claims in Gracetown's complaint should thus be dismissed.

### A.  Standard of Review

To withstand dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the assumption of truth does not apply to "allegations that amount to mere 'legal conclusions.'" *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021) (citation omitted). While "detailed factual allegations" are not necessary, a pleading must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### B. Due Process Does Not Require an ALJ Hearing Before Imposing OFAC Penalties

Gracetown first complains that its Fifth Amendment due process rights were violated because IEEPA penalties are imposed without a hearing before an ALJ, while penalties under the

21

Trading With the Enemy Act ("TWEA"), 50 U.S.C. §§ 4301-4341, another sanctions statute, require an ALJ proceeding. Compl. ¶ 63. The reason for the difference is simple: Congress prescribed it in 1992. *See* Cuban Democracy Act of 1992, Pub. L. No. 102-484, tit. XVII, § 1710(c)(2), 106 Stat. 2580-81 (now codified at 50 U.S.C. § 4315(b)(3)) ("The penalties provided under this subsection may be imposed only on the record after opportunity for an agency hearing in accordance with [5 U.S.C. §§ 554-557], with the right to prehearing discovery."); *see also* U.S. Dep't of Treasury, Off. of Foreign Assets Control, *Foreign Assets Control Regulations; Regulations Prohibiting Transactions Involving the Shipment of Certain Merchandise Between Foreign Countries; Cuban Assets Control Regulations: Civil Penalty Administrative Hearings*, 62 Fed. Reg. 6896 (Feb. 14, 1997) (amending OFAC regulations to allow for ALJ hearings in connection with TWEA penalties in response to statute).

IEEPA contains no comparable provision, which is the default for sanctions penalties.[6] The APA requires agency adjudication only when "adjudication [is] required by statute to be determined on the record after opportunity for an agency hearing," 5 U.S.C. § 554(a), and even then, contains an exception for "the conduct of military or foreign affairs functions," *id.* § 554(a)(4). Courts have thus unremarkably denied arguments by parties claiming they are entitled

---

[6] In addition to TWEA and IEEPA, OFAC is also authorized to impose sanctions under other statutes, such as the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 *et seq.*, but these do not require ALJ determinations either. *See, e.g.*, *Zevallos v. Obama*, 793 F.3d 106, 110 (D.C. Cir. 2015) (describing administrative process for designations and administrative review); *see also Enforcement of Penalties Against Violations of the U.S. Embargo on Cuba: Hearing Before the Subcomm. on the W. Hemisphere of the H. Comm. on Int'l Relations*, 104th Cong., 2d Sess. 33 (Mar. 5, 1996) (statement of R. Richard Newcomb, Director of OFAC) ("In all of the sanctions programs we administer, the regulations implementing our civil penalty authority provide for an opportunity for a person to respond to a proposed penalty and to challenge either the facts underlying the alleged violation or the severity of the penalty. However, no program, except those administered under TWEA, affords a full hearing with an administrative law judge for the imposition of a simple monetary fine.").

22

to ALJ determinations before OFAC actions governed by IEEPA. *See, e.g., Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 71 n.7 (D.D.C. 2008) (finding no requirement of ALJ hearing before OFAC designation, because hearings are required only when mandated by statute and "IEEPA contains no such requirement"); *cf. Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59, 70 (D.D.C. 2009), *aff'd*, 638 F.3d 794 (D.C. Cir. 2011) (petitioner not entitled to ALJ adjudication before OFAC decides on applicability of TWEA "general license" because "neither the licensing statute nor the regulation specify that OFAC must make determinations on the record or after a hearing").[7]

Gracetown's argument is thus that Congress's decision not to require ALJ adjudication under IEEPA was unconstitutional. *See* Compl. ¶ 63(a)-(c). There is no basis for such an argument. The analysis is governed by the standard set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), in a case that rejected the notion that due process required a government agency to provide an evidentiary hearing before terminating an individual's Social Security disability benefits. *Id.* at 323-24, 349. The Court there articulated the now-familiar three-factor inquiry, which considers (1) the private interest that will be affected by agency action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the Government's interest, including the

---

[7] There was little legislative debate on adding the provision requiring ALJ litigation to the TWEA. During the brief House committee discussion during which the amendment was adopted, the OFAC director explained that existing law already included judicial review of penalties because collection requires the Department of Justice to file suit; he thus agreed with one of the Representatives on the committee that requiring ALJ review "doesn't really add anything" in that regard, but "it doesn't hurt to add it" either. *Consideration of the Cuban Democracy Act of 1992: Hearings and Markup Before the H. Comm. on Foreign Affairs*, 102nd Cong., 2d Sess. 479-80 (1992) (colloquy between Reps. Lagomarsino and Berman and Richard Newcomb, Director of OFAC). There is thus no evidence that Congress enacted this provision out of a concern that ALJ litigation was required to afford persons subject to OFAC penalties the constitutional minimum of required due process.

function involved and the fiscal and administrative burdens that the additional procedural requirement would entail.  *Id.* at 335.

Here, these factors weigh against invalidating Congress's decision.  While Gracetown and other entities subject to OFAC penalties plainly have an interest affected by the agency's action, and this interest becomes more substantial as the penalty amount increases, Gracetown offers no valid basis for this Court to question Congress's judgment in not including ALJ adjudication as part of the administrative process.  Like other persons or entities subject to potential OFAC penalties of this type, Gracetown received a detailed pre-penalty notice that set forth the agency's views on why the company was subject to a penalty and (based on careful consideration of the factors listed in the agency's published Enforcement Guidelines) how the proposed penalty was calculated.  (AR32-44); Enforcement Guidelines § V(A)(1).  Gracetown was then given an opportunity to respond to this notice in writing and to provide information in response to agency requests and arguments, which it did.  (AR11, 712-28); Enforcement Guidelines § V(A)(2).  Finally, OFAC set forth its final determination of the penalty amount and responded to each of the arguments Gracetown raised in the comprehensive final penalty notice.  (AR11-19); Enforcement Guidelines § V(A)(3).

While this administrative process did not include an administrative trial before an ALJ, the risk of erroneous deprivation is low in light of the robust administrative process, and the administrative cost of ALJ litigation would be very high.  Moreover, post-assessment (and pre-payment) judicial review in district court is available, *see* 31 C.F.R. § 589.703 ("The issuance of the Penalty Notice shall constitute final agency action.  The violator has the right to seek judicial

24

review of that final agency action in Federal district court."),[8] as Gracetown has sought in this lawsuit.  There is thus no procedural due process violation.  *Cf., e.g.*, *Interior Glass Sys., Inc. v. United States*, 927 F.3d 1081, 1086 (9th Cir. 2019) (upholding constitutionality of rule according to which taxpayer who disputes tax penalty "to pay upfront before seeking judicial review"); *United States v. Cap. Tax Corp.*, No. 04 C 4138, 2007 WL 488084, at *3 (N.D. Ill. Feb. 8, 2007) (upholding constitutionality of scheme in which there is judicial review only after EPA assesses a penalty).  The Court should thus dismiss this claim.

### C. OFAC's Decision to Penalize Gracetown Is Not Unconstitutional National-Origin Discrimination

Gracetown next suggests that OFAC's decision not to further mitigate the penalty in question is based on the agency's supposed unconstitutional animus towards "the national origin of [Gracetown's] former and current ownership."  Compl. ¶ 65(a).  The Complaint offers only speculation in this regard.  *Id.* ("*[U]pon information and belief*, [OFAC] imposed a punitive penalty as a result of the national origin of [Gracetown's] former and current ownership, rather than on the nature, willfulness, or severity of the alleged conduct." (emphasis added)).

But Gracetown's past and present owners are relevant for far more direct reasons than their national origin.  Before 2018, Gracetown was ultimately owned by Deripaska, the very person whose later designation triggered the company's obligation to block and report the funds at issue. (AR33-34, 543.)  And shortly before his designation, Deripaska transferred ultimate ownership to his relative and known associate Ezubov, who was also involved with Baufinanz, including with

---

[8] *See Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151-52 (D.C. Cir. 2010) ("IEEPA is silent regarding the availability of and forum for judicial review of action taken under its auspices.  The [APA], though, authorizes judicial review of final agency action.  This authorization is inapplicable if another statute provides for judicial review or precludes application of the APA's judicial review provisions, or where the action challenged is committed to agency discretion by law . . . .  Thus, judicial review is available [here] . . . pursuant to the APA." (citations omitted)).

regard to the payments in question. (AR34 & n.17, 35, 51, 60, 67, 71, 543.) These facts support OFAC's conclusion that the violations here were willful or reckless, and thus merited a relatively harsh penalty. (AR13-14.) The fact that Deripaska and Ezubov happen to be Russian nationals is perhaps unsurprising given the nature of the sanctions at issue, but did not influence OFAC's decisionmaking.

Gracetown suggests it can prove discrimination by comparing its penalty to what it considers "comparable enforcement actions involving non-Russian-affiliated entities with similar first violations," in which OFAC "applied mitigation credit and imposed substantially lower penalties." Compl. ¶ 65(c); *see also id.* ¶ 55 & n.6 (discussing OFAC penalties for Nodus International Bank, Inc., and Bank of America, N.A., to which the agency awarded "'first violation' mitigation credit"). But "[t]o prove disparate treatment, a plaintiff must show that he and his comparators are similarly situated in all material respects." *Davis v. Metro N. Commuter R.R.*, No. 21 Civ. 387 (ER) (BCM), 2022 WL 2223018, at *7 (S.D.N.Y. June 21, 2022) ("Similarly situated does not mean identical but rather 'a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases.' The resemblance test relies on an objective standard. The test is satisfied when a plaintiff provides comparators a prudent person would objectively find to be roughly equivalent with the plaintiff." (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)) (citations omitted)).

Unlike Gracetown, neither Nodus nor Bank of America had received OFAC designation notices before their violations. (*Compare* AR 17 ("OFAC declines to grant Gracetown [the first-time] credit primarily because Gracetown willfully violated the URSR after OFAC provided actual notice of the company's sanctions obligations and associated risk, which explicitly alerted Gracetown that any unauthorized dealings with Deripaska, including his property and interests in

26

property, were prohibited."), *with* AR878-80 (Nodus), 910-11 (Bank of America).)  And Nodus voluntarily self-disclosed its violations to OFAC (AR879), while Gracetown's self-disclosure did not qualify as voluntary because it was made only after the Government had learned of the violations from another source (AR16).  Moreover, Bank of America undertook substantial forward-looking remedial measures to correct the deficiency that led to the violations (AR910-11), while Gracetown is a defunct entity that does not expect to engage in future transactions (AR17).  There is thus no basis for comparing these other resolutions with the OFAC penalty on Gracetown.

Gracetown offers no basis to support its conclusory claim of unconstitutional discrimination, and the Court should thus dismiss this claim as well.

### D. The OFAC Penalty Against Gracetown Is Not an Unconstitutionally Excessive Fine

Gracetown further claims that the penalty at issue violates the Eighth Amendment's prohibition on "excessive fines" because it is much larger than the amount of the underlying violative transactions.  Compl. ¶ 67.  Of course, that is by explicit legislative design.  When originally enacted in 1977, IEEPA provided for a civil penalty "not to exceed $10,000."  50 U.S.C. § 1705(a) (1977).  In 1996, Congress increased the maximum penalty to $50,000 for those who "willfully violate[], or willfully attempt[] to violate" the statute.  *See id.* § 1705(a), (b) (1996).  A decade later, the maximum penalty for non-willing violations was also increased to $50,000.  *See id.* § 1705(a) (2006).  The following year, Congress instituted the current scheme, in which the maximum penalty cannot exceed "the greater of—(1) $250,000; or (2) an amount that is twice the amount of the transaction that is the basis of the violation."  *Id.* § 1705(b) (2007).  The maximum penalty has since steadily increased due to the Federal Civil Penalties Inflation Adjustment Act of 1990, and as of 2024 stood at $368,136.  *See Inflation Adjustment of Civil Monetary Penalties*, 89

27

Fed. Reg. at 2139 tbl.1.[9]  Although OFAC concluded that Gracetown's base penalty was equal to the statutory maximum (AR38), it exercised its discretion in light of the general factors in its Enforcement Guidelines, and ultimately made two reductions (AR41, AR18), resulting in a URSR penalty 20% below the maximum.

A monetary penalty violates the Excessive Fines Clause only "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).  In *Bajakajian*, the Supreme Court held that two principles govern whether a judgment is consistent with the Excessive Fines Clause.  First, decisions "about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336.[10]  Second, "any judicial determination regarding the gravity of a particular . . . offense will be inherently imprecise." *Id.*  "Both of these principles counsel against requiring strict proportionality between the amount of a punitive [sanction] and the gravity of a criminal offense." *Id.*  Instead, a money judgment is unconstitutional only if it is "grossly disproportional to the gravity of the defendant's offense." *Id.* at 336-37.  That framework is highly deferential: A judgment need only "bear *some relationship* to the gravity of the offense that it is designed to punish." *Id.* at 334 (emphasis added).

---

[9] The much smaller failure-to-report regulatory penalties under the RPPR have also increased as a result of inflation, *see, e.g.*, *id.* at 2139 tbl.2, since they were first published in 2008, when they stood at $5,000 for failure to timely report and $1,000 for each additional 30 days, *see* Enforcement Guidelines § IV(B) (Sept. 8, 2008).

[10] *Cf. Combat Veterans for Cong. Pol. Action Comm. v. Fed. Election Comm'n*, 983 F. Supp. 2d 1, 18-19 (D.D.C. 2013), *aff'd*, 795 F.3d 151 (D.C. Cir. 2015) ("[I]in *Bajakajian*, 'the Court was primarily concerned that the potential penalty for illegal export of currency would be indefinite and unlimited—and disproportionate to the offense—if the government could seize whatever amount of currency the unwitting exporter happened to be carrying when caught.'  'No such problem exists' in the case of a fixed statutory penalty where 'the amount is neither indefinite nor unlimited.'" (quoting *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002)) (citation and internal quotation marks omitted)).

Courts typically examine four factors in determining whether a penalty is excessive, an analysis often conducted in the context of criminal penalties or forfeiture: "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct." *United States v. Viloski*, 814 F.3d 104, 114 (2d Cir. 2016) (internal quotation marks omitted). These factors support OFAC's penalty.

First, OFAC concluded that Gracetown's misconduct was egregious and either willful or reckless, as Gracetown had received actual notice of Deripaska's SDN designation and knew of his relationship with Baufinanz, which had overlapping ownership and personnel with Gracetown. (AR12-16.)

Second, Gracetown unquestionably falls into "the class of persons for whom the statute was principally designed"; Gracetown, a U.S. entity, was penalized for dealing in property within the United States in which a designated person had an interest, as proscribed by 31 C.F.R. § 589.201(a)(3), (4), a violation of which is subject to IEEPA penalties, *id.* § 589.701(a).

Third, the penalty reflects a 20% discount from the maximum URSR penalty that OFAC could have imposed. When, as here, a challenger is penalized less than the statutory maximum, it "weighs strongly in favor of [the penalty's] constitutionality" under the Excessive Fines Clause. *Viloski*, 814 F.3d at 114; *accord United States v. Schwarzbaum*, 127 F.4th 259, 284 (11th Cir. 2025) ("The presumption of constitutionality is particularly strong when the specific penalty sought by the Government is less than the statutory maximum."). In cases involving criminal penalties, courts look at the Sentencing Guidelines in addition to the statutory maximum, to determine whether a penalty is excessive in the defendant's particular circumstances. *See Viloski*,

29

814 F.3d at 114 (citing *Bajakajian*, 524 U.S. at 338-39 & n.14). Here, OFAC relied on its Enforcement Guidelines, which similarly guided the agency's discretion in selecting a penalty within the statutory limits for Gracetown's particular conduct, and thus supports the penalty's reasonableness.

And finally, OFAC appropriately concluded that Gracetown's conduct caused harm to the sanctions program that is not fully captured by the dollar amount of the violation. (AR15.) Gracetown's violations were prolonged, occurred after Gracetown received actual notice of Deripaska's designation, and resulted in the accrual of debt by a U.S. person (Gracetown) to a sanctioned entity (Baufinanz). (*Id.*)

These factors thus support the conclusion that OFAC's penalty was not unconstitutionally excessive. Other courts have reached similar conclusions in comparable cases. *See, e.g.*, *Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury*, 168 F. Supp. 3d 131, 137-38, 144 (D.D.C. 2016), *aff'd in relevant part*, 857 F.3d 913 (D.C. Cir. 2017) (finding OFAC penalty below statutory maximum—which was calculated based on the number of violative transactions rather than their monetary value—not to be excessive); *cf. Sanders v. Szubin*, 828 F. Supp. 2d 542, 552-54 (E.D.N.Y. 2011) (similar for TWEA penalty). Gracetown's claim to the contrary should be dismissed.

### E. Congress Constitutionally Authorized OFAC to Adjudicate IEEPA Violations and Impose Money Penalties

Finally, Gracetown argues that OFAC's imposition of money penalties through administrative enforcement violates the Seventh Amendment. Compl. ¶ 69. That argument fails as well. Congress validly authorized OFAC to decide when persons violate IEEPA because the statute concerns public rights that may be adjudicated by the Executive Branch without a jury. Courts conduct a two-part analysis when determining whether the Seventh Amendment entitles

30

the subject of an agency enforcement action to a jury trial. *See SEC v. Jarkesy*, 603 U.S. 109, 120 (2024). "The threshold issue is whether th[e] action implicates the Seventh Amendment." *Id*. Because a claim for punitive "money damages" without equitable considerations is a "prototypical common law remedy," the penalty challenged here does "implicate[] the Seventh Amendment." *Id.* at 123, 125.

But that is only the first step of the analysis. Courts next ask "whether Congress may assign" adjudication of the matter "to a non-Article III adjudicative body that does not use a jury as factfinder." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989). In delineating which matters may be determined by an agency, the Supreme Court has distinguished between "public rights" and "private rights." *Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 334 (2018). Disputes involving private rights are generally reserved to Article III courts. But for public rights, "the mode of determining matters . . . is completely within congressional control," such that Congress may decide the matter itself, "delegate that power to executive officers, or may commit it to judicial tribunals." *Crowell v. Benson*, 285 U.S. 22, 50 (1932) (internal quotation marks omitted). And when a public-rights matter is properly assigned to the Executive, "the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Oil States*, 584 U.S. at 345 (internal quotation marks omitted).

The Supreme Court has not "definitively explained" the difference between public and private rights, but its "precedents have recognized that the [public-rights] doctrine covers matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Id.* at 334 (quoting *Crowell*, 285 U.S. at 50). Thus, public rights include matters like taxation, immigration, public lands, and public benefits. *See Jarkesy*, 603 U.S. at 128-31. On the other

31

hand, actions that are "quintessentially suits at common law" concern private rights that must be adjudicated in Article III courts. *Id.* at 133. Thus, in *SEC v. Jarkesy*, the Supreme Court held that the Seventh Amendment prohibited the imposition of an administrative penalty when a person had violated the federal securities laws' antifraud provisions, which "replicate common law fraud." *Id.* at 120. The Court explained that the relevant securities provisions were "a common law suit in all but name," and so did not involve public rights. *Id.* at 135-36 (internal quotation marks omitted). In so holding, *Jarkesy* reiterated that Congress may direct the Executive to adjudicate matters of public rights—"[i]n contrast to common law claims"—and impose penalties for their violation. *Id.* at 129.

Here, OFAC's adjudication of IEEPA violations concerns public rights, not private ones. IEEPA vindicates uniquely sovereign interests of the United States. The statute allows the President to exercise certain authorities if he "declares a national emergency" with respect to an "unusual and extraordinary [foreign] threat . . . to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Once such an emergency is declared, the President may (among other things) "prohibit" broad categories of transactions or dealings involving property in which foreign countries or nationals have any interest, *id.* § 1702(a)(1)(B), and impose related recordkeeping and reporting requirements, *id.* § 1702(a)(2). The statute makes it "unlawful for a person to violate . . . any license, order, regulation, or prohibition issued" under IEEPA and says that "[a] civil penalty may be imposed on any person who commits [such] an unlawful act." *Id.* § 1705(a), (b). The penalty here was issued after the President declared a national emergency with respect to Russian involvement in Ukraine, *see* Exec. Order Nos. 13,660, 13,661, 13,662, and OFAC designated Deripaska as an SDN for acting on behalf of a senior Russian government

32

official and operating in the Russian energy sector—thus requiring all of his property and interests in property to be blocked (AR36, 813-19); *see* 31 C.F.R. § 589.201(a)(3), (4).

IEEPA concerns core public rights related to national security, foreign relations, and foreign commerce. The Supreme Court has long recognized that the exercise of sovereign authority over foreign commerce concerns public rights. In *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909), the Supreme Court upheld the imposition of civil penalties by the Secretaries of Commerce and Labor on transportation companies that brought in aliens with "dangerous contagious disease[s]," *id.* at 330 (internal quotation marks omitted). The Court rejected the contention that imposing such penalties required "the exertion of judicial power," in part because "no individual has a vested right" to engage in "foreign commerce." *Id.* at 334-35 (internal quotation marks omitted); *Jarkesy*, 603 U.S. at 129 (explaining that "Congress's power over foreign commerce" is "total"). Rather, executive officials could enforce civil monetary penalties "without the necessity of invoking judicial power" precisely because the legislative subjects—foreign commerce and immigration—were "matters exclusively within [Congress's] control." *Oceanic Steam*, 214 U.S. at 339; *see also id.* at 338 (requiring judicial imposition of all civil penalties would "magnif[y] the judicial to the detriment of all other departments of the government").

The same reasoning applies with even greater force here. As the Second Circuit has recognized, "in deciding to impose sanctions," "the President [acts] in the area of foreign policy pursuant to congressional authorization." *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007). IEEPA's prohibitions not only implicate Congress's "plenary" power over foreign commerce, *Oceanic Steam*, 214 U.S. at 334, but also the Executive's authority over foreign relations and national security, *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("Nor is there any

33

question generally that there is executive authority to decide what [foreign] policy should be."). Indeed, matters of national security like those at issue here are the quintessential example of exercises of governmental "authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell*, 285 U.S. at 50. By contrast, no private person could bring a "common law" action in "the courts at Westminster in 1789" to safeguard national security. *Jarkesy*, 603 U.S. at 128.

IEEPA's regulatory scheme differs from common law claims in other fundamental respects as well. Congress enacted IEEPA to protect against foreign "threat[s] . . . to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). It does not seek to determine "the liability of one individual to another" in a manner that would implicate private rights, *Crowell*, 285 U.S. at 51, and the United States is not stepping into the shoes of any injured party. Gracetown was subject to a penalty because it failed to adhere to IEEPA's requirements as defined by statute, not because it breached some common law tort or contract duty. "In both concept and execution," IEEPA was "self-consciously novel" as compared to private forms of action available at common law. *Jarkesy*, 603 U.S. at 137.

Gracetown's attempts to liken the penalty at issue here to common-law claims is unavailing. Gracetown invokes "common-law concealment" as a potential analogy, Compl. ¶ 69(e), but that is far afield. The elements of common-law fraudulent concealment (which is presumably what Gracetown is referring to) are "(1) nondisclosure of (2) material facts, in the face of (3) a duty to disclose, (4) scienter, (5) reliance, and (6) damages." *In re N.Y. Trap Rock Corp.*, 42 F.3d 747, 754 (2d Cir. 1994). Among many other differences with this case, OFAC does not have to show materiality, scienter, reliance, or damages to impose the failure-to-report penalties under the RPPR. *Cf. Sligo Creek Ctr. v. U.S. Dep't of Health & Human Servs.*, 177 F.4th 556,

34

557, 560-61 (4th Cir. 2026) (rejecting Seventh Amendment challenge to civil penalties imposed on a Medicare provider where "Congress did not merely repackage (or assign to a different party) a common law cause of action"). And Gracetown suggests no common-law analogy for the principal failure-to-block URSR penalties.

The Court should thus also dismiss Gracetown's Seventh Amendment claim.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government summary judgment on the first count of the Complaint and dismiss the remaining counts.

Dated:   New York, New York
         July 24, 2026

JAY CLAYTON
United States Attorney for the
Southern District of New York

By:   */s/ Jean-David Barnea*
      JEAN-DAVID BARNEA
      Assistant United States Attorney
      86 Chambers Street, 3rd Floor
      New York, New York 10007
      Telephone: (212) 637-2679
      jean-david.barnea@usdoj.gov
      *Attorneys for the Government*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules, as extended by the Court's order of May 14, 2026, ECF No. 38. As measured by the word processing system used to prepare it, this memorandum contains 11,317 words.

35