**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRACETOWN, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL *et al*.,<br><br>*Defendants*. | Case No. 26-cv-257-ER |

**PLAINTIFF GRACETOWN, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT ONE AND MOTION TO DISMISS COUNTS TWO THROUGH FIVE, AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNT ONE**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

A. Gracetown Received $31,250 Under a Pre-Sanctions Arrangement ..... 3

B. Gracetown Disclosed the Payments and Opposed an $8 Million Penalty ..... 4

C. OFAC Imposed $7.1 Million Without First-Violation Credit or a Hearing ..... 7

ARGUMENT ..... 8

I. THE $7.1 MILLION PENALTY MUST BE VACATED BECAUSE OFAC FAILED TO PROVIDE A REASONED EXPLANATION FOR ITS CALCULATION ..... 8

A. The APA Requires OFAC To Explain the Extraordinary Penalty It Chose ..... 9

1. OFAC Did Not Adequately Explain Why Gracetown's Acknowledged First-Violation Status Warranted No Reduction ..... 11

2. OFAC Did Not Explain Why Its Distinctions from the Record Enforcement Matters Justified Giving That Status No Mitigating Weight ..... 14

B. OFAC's Remaining Arguments Do Not Cure the Explanatory Defect ..... 18

C. The Explanatory Defect Was Prejudicial and Requires Vacatur and Remand ..... 21

II. GRACETOWN PLAUSIBLY ALLEGED THAT OFAC'S $7.1 MILLION PENALTY VIOLATES THE EXCESSIVE FINES CLAUSE ..... 21

A. The Violation-Specific Allegations Make Gross Disproportionality Plausible ..... 22

B. OFAC's Authority Does Not Foreclose Count IV ..... 25

III. GRACETOWN PLAUSIBLY ALLEGED OFAC IMPOSED THE $7.1 MILLION PENALTY WITHOUT CONSTITUTIONALLY ADEQUATE PROCESS ..... 26

IV. GRACETOWN PLAUSIBLY ALLEGED THAT NATIONAL ORIGIN PLAYED AN IMPERMISSIBLE ROLE IN OFAC'S FIRST-VIOLATION DECISION ..... 31

V. GRACETOWN PLAUSIBLY ALLEGED THAT OFAC'S FINAL PENALTY VIOLATED THE SEVENTH AMENDMENT ..... 33

CONCLUSION ..... 36

## TABLE OF AUTHORITIES

**Cases**

*Aleutian Capital Partners, LLC v. Scalia*,
975 F.3d 220 (2d Cir. 2020) .......... 9
*American Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) .......... 21
*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) .......... 18
*Atlas Roofing Co. v. Occupational Safety & Health Review Commission*,
430 U.S. 442 (1977) .......... 35
*Atterbury v. U.S. Marshals Serv.*,
941 F.3d 56 (2d Cir. 2019) .......... 27
*Austin v. United States*,
509 U.S. 602 (1993) .......... 22
*Baltimore Gas & Elec. Co. v. FERC*,
954 F.3d 279 (D.C. Cir. 2020) .......... 14
*Bellevue Hospital Center v. Leavitt*,
443 F.3d 163 (2d Cir. 2006) .......... 10, 14
*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 9
*Combat Veterans for Congress Political Action Committee v. Federal Election Commission*,
983 F. Supp. 2d 1 (D.D.C. 2013) .......... 25
*Darko v. Sessions*,
342 F. Supp. 3d 429 (S.D.N.Y. 2018) .......... 26
*Davis v. Metro N. Commuter R.R.*,
2022 WL 2223018 (S.D.N.Y. June 21, 2022) .......... 33
*Dillmon v. NTSB*,
588 F.3d 1085 (D.C. Cir. 2009) .......... 11
*Environmental Defense v. EPA*,
369 F.3d 193 (2d Cir. 2004) .......... 9
*Epsilon Electronics, Inc. v. U.S. Department of the Treasury*,
168 F. Supp. 3d 131 (D.D.C. 2016) .......... 15
*FERC v. Maxim Power Corp.*,
196 F. Supp. 3d 181 (D. Mass. 2016) .......... 30
*Friedman v. Sebelius*,
686 F.3d 813 (D.C. Cir. 2012) .......... 18
*Grid Radio v. FCC*,
278 F.3d 1314 (D.C. Cir. 2002) .......... 25
*Hauschild v. U.S. Marshals Serv.*,
2018 WL 3014095 (S.D.N.Y. June 15, 2018) .......... 28
*INS v. Yueh-Shaio Yang*,
519 U.S. 26 (1996) .......... 11
*International Fabricare Institute v. EPA*,
972 F.2d 384 (D.C. Cir. 1992) .......... 13
*Karpova v. Snow*,
402 F. Supp. 2d 459 (S.D.N.Y. 2005) .......... 10, 21, 30
*LeMoyne-Owen Coll. v. N.L.R.B.*,
357 F.3d 55 (D.C. Cir. 2004) .......... 10
*Loper Bright Enterprises v. Raimondo*,

603 U.S. 369 (2024) .......... 10
*Mathews v. Eldridge,*
424 U.S. 319 (1976) .......... 27, 29
*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 9, 15
*Munoz Materano v. Arteta*,
804 F. Supp. 3d 395 (S.D.N.Y. 2025) .......... 10
*Oceanic Steam Navigation Co. v. Stranahan*,
214 U.S. 320 (1909) .......... 34
*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 18
*PAZ Securities, Inc. v. SEC*,
494 F.3d 1059 (D.C. Cir. 2007) .......... 12, 18
*Saad v. SEC*,
718 F.3d 904 (D.C. Cir. 2013) .......... 13
*Sanders v. Szubin*,
828 F. Supp. 2d 542 (E.D.N.Y. 2011) .......... 26
*Schneider v. Rusk*,
377 U.S. 163 (1964) .......... 31
*SEC v. Jarkesy,*
603 U.S. 109 (2024) .......... 33, 34
*Tull v. United States*,
481 U.S. 412 (1987) .......... 33
*United States v. Bajakajian*,
524 U.S. 321 (1998) .......... 22, 24
*United States v. Schwarzbaum*,
127 F.4th 259 (11th Cir. 2025) .......... 24, 25
*United States v. Viloski*,
814 F.3d 104 (2d Cir. 2016) .......... 22
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 31
*von Hofe v. United States*,
492 F.3d 175 (2d Cir. 2007) .......... 24

**Statutes**

50 U.S.C. § 4315 .......... 29

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) .......... 13

**Regulations**

31 C.F.R. pt. 501, app. A .......... 11, 13, 18
74 Fed. Reg. 57 (Nov. 9, 2009) .......... 11

Plaintiff Gracetown, Inc. respectfully submits this memorandum of law in opposition to the motion of defendants (collectively, "OFAC") for summary judgment on Count I and dismissal of Counts II–V of the Complaint, ECF No. 1 ("Compl."), and in support of Gracetown's cross-motion for summary judgment on Count I.

## PRELIMINARY STATEMENT

Gracetown was a two-employee company whose only business was maintaining three U.S. residences. For roughly six years, Gracetown received monthly payments, generally $1,250 each, from a U.S. debtor under an installment arrangement established long before its founder (Oleg Deripaska) was sanctioned in 2018. Through a simple administrative oversight, these payments continued after Deripaska's designation. The payments were openly recorded by an outside accountant and were used for domestic property expenses—not a dollar was sent to or used for Deripaska's benefit. Indeed, as OFAC acknowledges, by this time Deripaska did not own either Gracetown or the residences in question. Gracetown ultimately discovered and disclosed these payments, blocked the debt, and cooperated with OFAC's investigation. It had never been penalized by OFAC and had been defunct for three years by the time OFAC imposed a penalty.

Despite these entirely mundane facts, OFAC labeled the conduct egregious and elected to impose a $7.1 million penalty for sanctions violations involving just $31,250; a penalty more than *228 times* the value of the payments in question—a more than two-million-percent penalty, which was multiple orders of magnitude greater than comparable actions identified to OFAC. Nothing in the record justifies this grossly-excessive penalty, because OFAC's reason for this sanction was both political and impermissible: OFAC labeled Deripaska a "*Kremlin-connected oligarch,*" and at a time of heighted tensions between the United States and the Russian Federation over the conflict in Ukraine, OFAC plainly felt pressured to "act firmly against those who … aid our

adversaries."[1]

But OFAC's rush to make an example (*i.e.* headlines) out of Gracetown's administrative oversight unfortunately led to a litany of errors. Most obviously, OFAC gave Gracetown's acknowledged first-violation status zero mitigating weight—even though it credited that same status in at least four other identified matters, including cases involving knowing misconduct and direct shipments to sanctioned entities—aggravating factors not present here. The APA required OFAC to explain why Gracetown received none of the first-violation mitigation its Guidelines generally provide, which was a choice involving more than $2.2 million in potential mitigation. But OFAC failed to do so. That defect alone requires vacatur and remand.

The defects do not stop there. OFAC's zeal to maximize a penalty against Gracetown resulted in a fine of approximately $294,509 for each $1,250 or $2,500 installment, a punishment which was grossly disproportional and in violation of the Excessive Fines Clause. OFAC also rejected Gracetown's explanations of the violation as simple oversight as "not credible," without any mechanism to present and test testimony on the disputed questions driving this penalty. And while OFAC tried to dance around what was driving this excessive punishment, its admissions around a "now-designated Russian oligarch," coupled with its differing treatment of the same first-violation history elsewhere, plausibly support an inference of national-origin discrimination. Finally, OFAC's authority to administer sanctions does not establish an exception to the jury guarantee for this final adjudication of punitive monetary liability. The Court should grant Gracetown's cross-motion on Count I, vacate the Penalty Notice, remand for reconsideration, and deny dismissal of the remaining claims.

---

[1] *See* Press Release, "OFAC Imposes $7 Million Penalty on Company Tied to Sanctioned Russian Oligarch," Dept. of Treasury, December 4, 2025, *available at* https://home.treasury.gov/news/press-releases/sb0328 (last visited Sept. 18, 2026).

# BACKGROUND

## A. Gracetown Received $31,250 Under a Pre-Sanctions Arrangement

Gracetown is a Delaware corporation formed in 2006 to manage three residential properties—one in Washington, D.C. and two in New York City. Compl. ¶ 17; AR 33, 543, 555. Its staff consisted of a New York property manager, Quinn Bencivenga, and a Washington caretaker. Compl. ¶ 18 & Ex. 5 at 2; AR 33–34, 543. Oleg Deripaska was Gracetown's original ultimate beneficial owner, but transferred that interest to Pavel Ezubov, a Russian national, on January 25, 2018. Compl. ¶¶ 19, 54; AR 543, 564.

The payments at issue originated in November 2013 arrangement, more than four years before Deripaska's designation. Compl. ¶¶ 19, 23 & Ex. 5 at 2; AR 34, 36, 543. Scott McCarthy, a U.S. person, entered into a settlement agreement to resolve a debt to Baufinanz Investments Limited ("Baufinanz"), a British Virgin Islands company owned by Deripaska. *Id.* Gracetown was not a party to the settlement, but the agreement directed McCarthy to send Gracetown monthly installments of $1,250. Compl. ¶¶ 23–24 & Ex. 5 at 2; AR 61, 543. Gracetown then used the receipts for its expenses and recorded a corresponding unsecured debt to Baufinanz, rather than holding money for transfer on to Baufinanz. Compl. ¶¶ 25–26 & Ex. 9 at 5; AR 67, 71, 543–44.

On April 6, 2018—months after Gracetown had been transferred to Ezubov—OFAC designated Deripaska a Specially Designated National ("SDN"). Compl. ¶ 19; AR 34, 36. Because he remained Baufinanz's ultimate beneficial owner, OFAC treated the funds owed to him as blocked property under the Ukraine-/Russia-Related Sanctions Regulations ("URSR"). Compl. Ex. 6 at 3; AR 36–37. That same day, OFAC issued a Notification of Blocking of a Third Person ("Notification"), which Gracetown received through its registered agent. Compl. ¶ 27 & Ex. 4; AR 12, 821. The Notification advised Gracetown that unauthorized dealings in property in which

Deripaska or any blocked person had an interest were prohibited, and that blocked property must be reported within 10 business days. Compl. Ex. 4 at 2; AR 822. The Notification did not name or identify Baufinanz, McCarthy, or their settlement agreement. Compl. ¶ 27 & Ex. 4; AR 821–23.

The payments from McCarthy to Gracetown continued. Between April 24, 2018, and May 7, 2020, Gracetown received twenty-three $1,250 payments and one $2,500 payment, totaling $31,250. Compl. Ex. 6, tbl. 1; AR 30. These funds remained in the United States, were used exclusively for property maintenance and operating expenses, and were never transferred to Deripaska or Baufinanz. Compl. ¶¶ 25, 28–29; AR 543–44, 734. Gracetown's outside accountant documented the payments in the ordinary course and their accounting treatment did not change after designation, nor did Gracetown conceal them. Compl. ¶¶ 24, 28; AR 71, 75, 545, 716.

Gracetown unfortunately never connected the Notification with this preexisting stream of small payments from McCarthy, and Ezubov did not recall his earlier approval of the arrangement, and in any event, he did not have an active role in Gracetown's day-to-day operations. Compl. ¶¶ 26, 29, 31. The record includes Bencivenga's acknowledgment that she received the agreement and first check in December 2013, as well as the agreement's direction that notices to Baufinanz be sent to her at Gracetown and to counsel at Bryan Cave. Compl. Ex. 7 at 3–4 & Ex. 9 at 4; AR 63, 72. But when McCarthy contacted her about the settlement in May 2020, she wrote that she "never had an agreement or knew anything about the arrangement" and had "just received a check . . . every month," adding: "Maybe the accountants know since they consider it every year when doing taxes?" AR 74–75.

**B. Gracetown Discovers and Disclosed the Payments, and Opposed an $8 Million Penalty**

On January 11, 2022, Gracetown disclosed the payment arrangement to OFAC and filed a blocking report for its total accumulated $103,750 debt to Baufinanz. Compl. ¶¶ 32–33 & Ex. 5 at

1–3; AR 542–44, 696, 698. Its disclosure distinguished that debt, most of which predated designation, from the $31,250 received afterward. Compl. Ex. 5 at 2–3; AR 543–44. Gracetown thereafter responded to OFAC's March 2022 administrative subpoena and supplemental information requests and cooperated with OFAC by entering a tolling agreement extending the applicable limitations period. Compl. ¶¶ 36, 38–40; AR 563, 617, 750–51.

On October 8, 2024, OFAC issued a Pre-Penalty Notice ("PPN") proposing an $8,022,832 penalty. Compl. ¶ 42; AR 2, 21. Under the Economic Sanctions Enforcement Guidelines ("Guidelines") applied by OFAC, voluntary self-disclosure ("VSD") and egregiousness determinations set the base penalty, which OFAC could adjust for aggravating and mitigating General Factors. OFAC classified the matter as egregious and non-VSD and selected a statutory-maximum URSR base of $8,835,264. Compl. Ex. 6 at 4–5 & tbl. 1; AR 24–25. To calculate that base, OFAC used the maximum civil monetary penalty per violation under the International Emergency Economic Powers Act ("IEEPA"): the greater of $368,136 or twice the transaction value, yielding the same $368,136 base for every installment. *Id.* OFAC denied VSD treatment, claiming federal authorities had learned of the arrangement before Gracetown's disclosure. Compl. Ex. 6 at 4; AR 16 n.43, 24, 761.

OFAC relied on the Notification and the ownership and personnel relationships described above to find willfulness and awareness, and it also found harm to sanctions objectives and treated Gracetown's remedial response as aggravating. Compl. Ex. 6 at 5–6; AR 25–26. OFAC credited the tolling agreement and information Gracetown supplied as cooperation, applied a 10% reduction to the URSR base, and added a separate $71,094 penalty for late reporting under the Reporting, Procedures and Penalties Regulations ("RPPR"). Compl. Ex. 6 at 6–7; AR 26–27.

The Guidelines separately provide that, in first-violation cases, the base penalty "generally

will be reduced up to 25 percent." 31 C.F.R. pt. 501, app. A § V.B.2.b.ii. OFAC acknowledged Gracetown received no Penalty Notice or Finding of Violation in the five years preceding the earliest transaction, making it eligible for mitigation, but OFAC proposed no reduction. Compl. Ex. 6 at 6; AR 26. Instead, OFAC stated that Gracetown was formerly owned by a "now-designated Russian oligarch" and managed properties purchased by "the same oligarch." Compl. Ex. 6 at 6; AR 26. OFAC also cited Ezubov's and Bencivenga's roles in the settlement arrangement, alleged continuing ties to Deripaska's undefined 'broader network', and the Notification. It deemed Gracetown's sanctions history "neither mitigating nor aggravating." *Id.*

Gracetown challenged the proposed penalty through submissions dated November 22, 2024, January 10, 2025, and March 14, 2025. Compl. ¶ 41 & Ex. 3; AR 713, 725, 730. It disputed OFAC's culpability findings, explaining the Notification had not prompted its personnel to connect the longstanding settlement payments to sanctions restrictions, and that the payments had continued without concealment or onward transfers to a sanctioned party. Compl. ¶¶ 31, 47–51 & Ex. 3 at 4–6; AR 716–18. Gracetown also explained that it was now non-operational, with no employees or funding and almost no cash, arguing no specific deterrence was needed. Compl. ¶ 21; AR 721–22, 736.

Gracetown sought first-violation credit, objecting that the Notification was not a prior penalty or Finding of Violation. Compl. Ex. 3 at 8; AR 720. It pointed to mitigation under the same five-year criterion in other OFAC enforcement actions involving Bank of America and SkyGeek, and to other OFAC enforcement actions involving Nodus and S&P Global as examples of less severe responses to low-value transactions. Compl. ¶ 55 & n.6; *id.* Ex. 3 at 7–9 & Ex. 13; AR 719–21, 726–27. Gracetown's March submission renewed requests for first-violation and cooperation mitigation and proposed a $20,000 settlement. Compl. ¶ 41 & n.3; AR 730, 736, 738.

**C. OFAC Imposed $7.1 Million Penalty Without First-Violation Credit or a Hearing**

On December 4, 2025, OFAC issued its final Penalty Notice, imposing a $7,139,305 penalty. Compl. ¶ 57; AR 2–3. OFAC increased cooperation mitigation from 10% to 20% of the URSR base, leaving a $7,068,211 URSR component and the unchanged $71,094 RPPR component. Compl. Ex. 7 at 6–7; AR 7–8. The resulting URSR penalty was the equivalent of approximately $294,509 for each $1,250 or $2,500 installment. That equals about 236 times each $1,250 payment and 118 times the single $2,500 payment. Compl. Ex. 6, tbl. 1; AR 7–8, 30.

The Notice maintained OFAC's egregiousness determination. It deemed Gracetown's Notification explanation "not credible" and relied on the 2013 documents to infer Bencivenga's knowledge and Ezubov's authority to act for both companies. Compl. Ex. 7 at 1–4; AR 2–5. OFAC also found sanctions-program harm because the payments satisfied McCarthy's obligation to Baufinanz and created a corresponding Gracetown debt, irrespective of who owned the properties maintained with the funds. Compl. Ex. 7 at 4; AR 5.

OFAC again denied first-violation credit. It acknowledged that Gracetown had received no Penalty Notice or Finding of Violation during the relevant five-year period and clarified that it was not treating the Notification as equivalent to either. Compl. Ex. 7 at 6; AR 7. OFAC nevertheless withheld credit, citing willful conduct after actual notice, continued operation within Deripaska's "network" without assessing sanctions risk or implementing meaningful compliance controls, and the unlikelihood that mitigation would promote future compliance by a "defunct" entity. *Id.* It separately denied mitigation under General Factor J, reasoning that a public action would encourage compliance by similarly situated entities. *Id.* Addressing the enforcement matters Gracetown cited, OFAC stated that none involved violations after prior notice from OFAC, and it emphasized case-specific decisionmaking and contrasted those settlements and Findings of

Violation with its issuance of a Penalty Notice here. Compl. Ex. 7 at 4 n.5; AR 5 n.5.

Notwithstanding the written submissions, Gracetown received no formal hearing at which to present evidence and no jury trial before OFAC imposed the penalty. Compl. ¶¶ 58–59, 63(b), (d), 69(f). The Notice declared its issuance "final agency action" and required payment or installment arrangements within 30 days of receipt. Compl. Ex. 7 at 7; AR 8. It warned that nonpayment would trigger interest and an administrative charge, with further penalty charges if payment became more than ninety days overdue, and that the matter could be referred for administrative collection or recovery in a federal civil suit. Compl. Ex. 7 at 7–8; AR 8–9.

Gracetown filed this action on January 12, 2026, seeking vacatur and declaratory and injunctive relief. OFAC now seeks summary judgment on Count I and dismissal of Counts II–V. Gracetown opposes those requests and cross-moves for summary judgment on Count I.

## ARGUMENT

### I. THE $7.1 MILLION PENALTY MUST BE VACATED BECAUSE OFAC FAILED TO PROVIDE A REASONED EXPLANATION FOR ITS CALCULATIONS

OFAC recasts Count I as a request for the Court to reweigh OFAC's penalty factors. *See* Mot. 17–18. This is wrong. Even if OFAC could treat the twenty-four payments as twenty-four URSR violations, classify them as egregious and not voluntarily self-disclosed, and begin from the statutory-maximum base, the APA still required OFAC to explain how it moved from that base through the distinct considerations in the framework to the penalty it selected. OFAC did not.

OFAC's explanation fails at two connected points. First, its reasoning does not adequately explain why Gracetown's acknowledged first-violation status—an identified consideration for which the Guidelines say the base penalty "generally will be reduced up to 25 percent"—warranted no reduction. Second, OFAC did not adequately explain why its distinctions from record enforcement matters justified treating the same formal first-violation history as having no

mitigating force here. OFAC's separate determinations concerning VSD status, remedial response, cooperation, willfulness, and harm do not supply the missing explanation.

The record shows why these omissions matter: OFAC treated twenty-four payments totaling $31,250 as twenty-four separate URSR violations and separately imposed a $71,094 RPPR penalty, producing maximum exposure of $8,906,358. The final penalty of $7,139,305 is more than 228 times the underlying payments. AR 17–18, 38, 44. That gap is not academic: The unexplained loss of first-violation credit concerns a potential adjustment of up to $2,208,816, and reasoned reconsideration could materially change the result.

**A. The APA Requires OFAC To Explain the Extraordinary Penalty It Chose**

The parties agree the Court decides Count I on the certified administrative record as a question of law with no Rule 56.1 statement required. *See* Mot. 14–17 & n.5; *accord Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Aleutian Capital Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020). The question is whether OFAC's penalty is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), which requires the Court to examine whether OFAC considered the relevant evidence and factors and supplied a satisfactory contemporaneous explanation connecting its findings to the penalty imposed. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–43, 50 (1983).

That review demands that OFAC show its work. It must "examine the relevant data and articulate a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation omitted); *accord Environmental Defense v. EPA*, 369 F.3d 193, 201 (2d Cir. 2004). An agency acts arbitrarily when it fails to consider an important aspect of the problem or reaches a conclusion that cannot reasonably be attributed to a difference in view or agency expertise. *State Farm*, 463 U.S. at 43.

An agency must therefore "cogently explain why it has exercised its discretion in a given manner," and where the record supplies "no findings and no analysis . . . to justify the choice made," the Court must set the action aside. *State Farm*, 463 U.S. at 48. This demand has teeth when specific financial penalties are involved: An agency cannot simply assert that identified considerations justify a chosen figure without explaining why that figure, rather than another, was appropriate. *Bellevue Hospital Center v. Leavitt*, 443 F.3d 163, 179 (2d Cir. 2006) (agency acted arbitrarily where it chose "precisely ten percent" without explanation). "The need for an explanation is particularly acute when an agency is applying a multi-factor test through case-by-case adjudication." *LeMoyne-Owen Coll. v. N.L.R.B.*, 357 F.3d 55, 61 (D.C. Cir. 2004).

The two features cited by OFAC do not relax that demand. First, OFAC relies on *Karpova v. Snow*, 402 F. Supp. 2d 459, 466 (S.D.N.Y. 2005), *aff'd*, 497 F.3d 262 (2d Cir. 2007), which applied a deferential standard to an OFAC civil penalty. Mot. 17, 21. But *Karpova*'s observation that courts owe "great deference" addressed the President's "predicate" foreign-policy determination that the Iraq sanctions regime remained warranted—not an exemption from reasoned explanation when OFAC selects an individual penalty, 497 F.3d at 270—and the Second Circuit still required OFAC's decisional path to be reasonably discernible, *id.* at 268–69.[2]

Second, the above requirements do not bend merely because the framework OFAC invoked is discretionary. Mot. 18 (citing *Bellevue Hosp.*, 443 F.3d at 174). An agency must explain *how* it exercises discretion under the framework it selects. *Munoz Materano v. Arteta*, 804 F. Supp. 3d 395, 422 (S.D.N.Y. 2025) (Ramos, J.) (holding parole revocation arbitrary and capricious for

[2] Likewise, OFAC's other foreign-affairs authorities, Mot. 16–17, establish deference, not an exemption from reasoned APA review. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010); *Regan v. Wald*, 468 U.S. 222, 242 (1984); *see also Islamic American Relief Agency v. Unidentified FBI Agent*s, 394 F. Supp. 2d 34, 44–46 (D.D.C. 2005), *aff'd in part*, *Islamic American Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007).

failure to undertake the required individualized analysis); *cf. Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 395 (2024) (explaining that courts must ensure reasoned decisionmaking even where Congress delegates discretionary authority). Here, Treasury issued the Guidelines as "enforcement guidance," described them as a "general framework," and preserved OFAC's case-specific discretion. Economic Sanctions Enforcement Guidelines, 74 Fed. Reg. 57,593 (Nov. 9, 2009); 31 C.F.R. pt. 501, app. A. OFAC announced the Guidelines as the framework it would follow, expressly used that framework to calculate this penalty, AR 12–18, 37–41, and thus remained obligated to explain how it did so.

**1. OFAC Did Not Adequately Explain Why Gracetown's Acknowledged First-Violation Status Warranted No Reduction**

OFAC's treatment of first-violation status is the clearest defect. Under the Guidelines, OFAC first selects a base amount by considering whether the matter is egregious and whether the apparent violations were voluntarily self-disclosed. 31 C.F.R. pt. 501, app. A § V.B.2.a. It then may adjust that amount to reflect applicable General Factors. In cases involving a Subject Person's first violation—ordinarily meaning no Penalty Notice or Finding of Violation during the preceding five years—the base penalty "generally will be reduced up to 25 percent." *Id.* § V.B.2.b.ii. That specified range was deliberate: In finalizing the Guidelines, OFAC declined to prescribe percentages for most General Factors because the calculus is holistic, but identified first offenses and substantial cooperation as the exceptions for which it supplied ranges. 74 Fed. Reg. at 57,598. The provision does not guarantee a positive minimum, but "generally will be reduced" identifies mitigation as the ordinary treatment when the criterion is met, and related "agency action is arbitrary and capricious if it departs from agency precedent without explanation." *Dillmon v. NTSB*, 588 F.3d 1085, 1090 (D.C. Cir. 2009); *cf. INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)

(recognizing that an irrational departure from an announced and followed general policy may be arbitrary and capricious even where the agency's discretion was "unfettered at the outset").

OFAC here made the predicate first-violation finding: The PPN acknowledged "Gracetown has not received a Penalty Notice or Finding of Violation from OFAC in the five years preceding the earliest date of the transactions giving rise to the Apparent Violations," making it eligible for first-violation treatment. AR 40. Yet the PPN then declared Gracetown's sanctions history "neither mitigating nor aggravating" and awarded no credit. AR 41. After Gracetown objected, the Penalty Notice again acknowledged that history and stated that OFAC was "not considering the Notification as the equivalent of a Penalty Notice or Finding of Violation." AR 17.

In the Penalty Notice, OFAC offered three reasons for awarding no first-violation credit, but none adequately explain a departure from the Guidelines' ordinary first-violation treatment. First, OFAC's reliance on the Notification to establish culpability does not explain why Gracetown's acknowledged first-violation status warranted no reduction. OFAC had already used the April 2018 Notification to find willfulness or recklessness, to classify the matter as egregious, and to select the statutory maximum as the base penalty. AR 13–15, 38–39. Selection of a statutory-maximum base did not dispense with reasoned consideration of the separately identified first-violation adjustment. *See LeMoyne-Owen College*, 357 F.3d at 61 (remanding for the agency to explain "which factors are significant and which less so, and why" under its multifactor test). Yet OFAC's first reason for denying credit was that Gracetown willfully violated the URSR after receiving actual notice from OFAC. AR 17; Mot. 13. That simply repeats OFAC's culpability finding, without adequately explaining the denial of the ordinarily contemplated first-violation mitigation. *See PAZ Securities, Inc. v. SEC*, 494 F.3d 1059, 1064–65 (D.C. Cir. 2007) (remanding where agency's emphasis on obligation violated failed to address distinct mitigation arguments).

That omission is not cured by OFAC's statement that it did not equate the Notification with a prior Penalty Notice or Finding of Violation. AR 17; Mot. 12–13. That clarification certainly establishes that Gracetown met the Guidelines' ordinary first-violation criterion, but only sharpens the question: What role did that status play in the calculation? The Guidelines permit OFAC to weigh the Notification at more than one stage—under General Factor A.5 and the first-violation adjustment—but OFAC must reasonably explain its treatment of first-violation status. 31 C.F.R. pt. 501, app. A §§ III.A.5, V.B.2.b.ii. OFAC did not reconcile its reliance on the Notification with the Guidelines' ordinary treatment of first violations or its recognition of the same qualifying enforcement history as mitigating in the cited matters. AR 17, 879, 884, 889, 911.

Second, OFAC stated Gracetown continued to operate within the so-called 'Deripaska network' without assessing sanctions risk or implementing meaningful compliance controls. AR 17. Perhaps those facts could support a more severe penalty (assuming it could explain what this 'network' was), but OFAC still had to meaningfully address the mitigation identified in its own Guidelines. *See Saad v. SEC*, 718 F.3d 904, 913–14 (D.C. Cir. 2013) (remanding for consideration of distinct potential mitigators despite intentional misconduct, including a factor expressly identified in the sanction guidelines); *International Fabricare Institute v. EPA*, 972 F.2d 384, 392 (D.C. Cir. 1992) ("A conclusory statement . . . does not in itself provide the 'satisfactory explanation' required in rulemaking.") (quoting *State Farm*, 463 U.S. at 43).

Third, OFAC reasoned that first-violation mitigation would not promote Gracetown's future compliance because it was defunct. AR 17; Mot. 13. But the first-violation provision does not condition mitigation on continued operations, and future compliance is addressed separately under General Factor J. 31 C.F.R. pt. 501, app. A §§ III.J, V.B.2.b.ii. That textual structure supports a negative implication: expressly addressing future compliance in Factor J while omitting it from

the first-violation provision weighs against importing a continued-operations requirement into the latter. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) ("The expression of one thing implies the exclusion of others."). That OFAC could reasonably conclude a public action would deter similar entities does not explain why the absence of prior enforcement history itself had no mitigating value. AR 17–18.

OFAC's answer that the reduction was "optional" or "discretionary" similarly does not explain the issue away. Mot. 13, 20. Discretion describes the range of permissible outcomes; it does not explain the outcome selected. *See Bellevue Hosp.*, 443 F.3d at 179.[3] The APA required a rational connection not merely between the record and a general conclusion that Gracetown's conduct was serious, but between the record and the particular post-base choice OFAC made: a 20% cooperation reduction and no reduction for an acknowledged first violation. AR 17.

**2. OFAC Did Not Explain Why Its Distinctions from the Record Enforcement Matters Justified Giving That Status No Mitigating Weight**

OFAC further failed to reconcile its denial of first-violation mitigation with its own enforcement record. In the four enforcement matters discussed below, OFAC treated the absence of a Penalty Notice or Finding of Violation during the relevant five-year period as mitigating—even in matters involving management awareness, egregious conduct, and direct shipments to a sanctioned entity—yet gave the same history no mitigating weight here. AR 17, 879, 884, 889,

---

[3] This Court's recent application of the APA confirms an agency must do more than state a reason. In granting preliminary relief, this Court rejected the end of the COVID emergency as a reason to rescind extensions for funding intended to address the pandemic's continuing effects because "the reason proffered was not a reasonable explanation." *State of New York v. United States Department of Education*, No. 25 Civ. 2990 (ER), May 6, 2025 Tr. 44:18–45:7 (S.D.N.Y.), ECF No. 91. Here, the question is likewise not whether OFAC identified reasons to impose a severe penalty, but whether it explained why those reasons warranted giving Gracetown's acknowledged first-violation status no mitigating weight under the Guidelines and in light of the comparator record.

910–11. That is textbook arbitrary and capricious agency action.

An agency that treats a consideration as generally mitigating in comparable matters—then gives it zero weight in one—owes more than a general description of the misconduct's seriousness: It owes an explanation of why this case falls outside the factor-specific pattern reflected in the four record matters. *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) ("[I]t cannot be argued 'the great principle that like cases must receive like treatment' is anything but black letter administrative law.") (quoting *NLRB v. Gen. Stencils, Inc.*, 438 F.2d 894, 905 (2d Cir. 1971) (Friendly, J.)). As OFAC's authority acknowledges, *see* Mot. 30, "[r]eview for whether an agency's sanction is arbitrary or capricious requires consideration of whether the sanction is out of line with the agency's decisions in other cases." *Epsilon Electronics, Inc. v. U.S. Department of the Treasury*, 168 F. Supp. 3d 131, 145 n.2 (D.D.C. 2016) (quoting *Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013)), *aff'd in part, rev'd in part*, 857 F.3d 913 (D.C. Cir. 2017). Such an explanation is arbitrary and capricious when the stated reasons fail to supply a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43, and a court will "overturn a rulemaking as arbitrary and capricious where the [agency] has failed to respond to specific challenges that are sufficiently central to its decision," *International Fabricare*, 972 F.2d at 389.

Here, in the four enforcement matters presented by Gracetown—SkyGeek, S&P Global, Bank of America, and Nodus—OFAC expressly treated the absence of a prior Penalty Notice or Finding of Violation during the relevant five-year period as mitigating. AR 879, 884, 889, 911. Yet OFAC's distinctions do not adequately reconcile that different treatment.

Begin with SkyGeek. It illustrates OFAC's recognition of first-violation mitigation despite substantial aggravating circumstances—a comparison Gracetown expressly presented in a

dedicated post-PPN submission. AR 725–28, 888–89. SkyGeek, a New York aviation-products company within a sophisticated global enterprise, attempted two refund payments to designated entities in Russia's aerospace and technology sectors and made four shipments to one of them. The six transactions totaled $20,941.39. OFAC stated the shipments directly benefited an SDN, undermined sanctions objectives, and might have contributed to Russian military capabilities. It also found SkyGeek had reason to know it was dealing with blocked persons and lacked controls commensurate with its risks. Yet OFAC classified the matter as non-egregious, identified SkyGeek's absence of a prior Penalty Notice or Finding of Violation as mitigating, and settled the six apparent violations for $22,172. AR 887–89. SkyGeek also received VSD credit for four apparent violations and remediation credit, neither of which Gracetown received. AR 16, 887–89. Those differences may explain much of the gap between the overall dispositions, but they do not explain the first-violation difference: OFAC gave formal first-violation history mitigating effect despite direct shipments to a designated actor, sanctions-program harm, sophistication, and deficient controls, while giving the same history no effect here. OFAC's reliance on the April 2018 Notification cannot possibly explain why that distinction warranted withholding the first-violation mitigation recognized in SkyGeek, despite plainly less-egregious conduct here.

Next is S&P Global. There, OFAC treated first-violation status as mitigating despite continued conduct after management expressly recognized the sanctions concern. AR 883–84. That matter involved repeated reissuance and re-dating of invoices after a payment was rejected because of sanctions concerns, with further reissuance after management acknowledged that payment against an old invoice could constitute a prohibited extension of credit. OFAC found that management knew or had reason to know the conduct would violate sanctions, classified the matter as non-egregious and not voluntarily self-disclosed, and settled $82,500 in apparent violations for

$78,750—expressly treating the absence of a prior Penalty Notice or Finding of Violation as mitigating. AR 882–84. Unlike SkyGeek, S&P Global received no VSD credit. OFAC also cited remediation and cooperation but separately treated its clean formal history as mitigating despite management awareness and repeated invoice changes. Gracetown's identical formal history received no such weight.

Bank of America shows the same practice on a far larger scale. That matter involved 213 apparent violations, seventy-nine of which OFAC classified as egregious; significant potential sanctions-program harm; and a screening deficiency that remained uncorrected for more than two years after a compliance official became aware of it. The disclosures did not qualify as VSDs, and the bank had a prior sanctions settlement. Yet because the bank had not received a Penalty Notice or Finding of Violation during the relevant five-year period, OFAC expressly treated that circumstance as mitigating, and the adjustments—together with remediation, cooperation, and settlement—reduced an $83.65 million base penalty to $16,562,700. AR 910–11. A sophisticated financial institution's uncorrected, multi-year screening failure and its prior sanctions history did not extinguish the mitigating force of a clean formal enforcement history. Yet Gracetown received no first-violation credit—without any reasoned explanation from OFAC.

Nodus completes that pattern. Nodus transacted in blocked property without obtaining a license, even though senior managers knew one was required, and committed related recordkeeping and reporting violations. OFAC identified the absence of a prior Penalty Notice or Finding of Violation as mitigating and issued only a Finding of Violation, with no monetary penalty. Nodus's qualifying VSD and remediation distinguish it from Gracetown, but its managers' awareness of the licensing requirement makes the first-violation treatment relevant: OFAC still credited Nodus's clean enforcement history. AR 878–80.

Across four distinct matters, OFAC's treatment was constant: It expressly treated the absence of a recent Penalty Notice or Finding of Violation as mitigating. After Gracetown presented these specific challenges for OFAC to explain, OFAC provided three reasons for the distinction: none of the four cited matters involved violations after the subject received prior notice directly from OFAC; enforcement decisions are case-specific; and the other matters ended in settlements or Findings of Violation rather than a Penalty Notice. AR 15 n.36.

But identifying distinctions is not the same as explaining those distinctions' consequences, and a response that "did not address [the objection] so much as sidestep it" is not a reasoned one. *Ohio v. EPA*, 603 U.S. 279, 295 (2024). First, the absence of post-notice violations in the cited matters may bear on mitigation, but OFAC did not adequately explain why it warranted departing from the Guidelines' ordinary treatment of Gracetown's qualifying enforcement history. Second, the truism that each case is unique does not explain the material significance of the differences OFAC identified. Third, even if settlement status can support an additional discount, settlements generally follow the same penalty principles. 31 C.F.R. pt. 501, app. A § V.C.1. Settlement posture therefore does not itself explain why OFAC recognized first-violation history as mitigating in the cited matters but assigned the same formal history no mitigating force here. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018) (rejecting settlement status, "without more," as a justification for treating similarly situated competitors differently). Three distinctions, yet no reasonable explanation for withholding first-violation mitigation.

### B. OFAC's Remaining Arguments Do Not Cure the Explanatory Defect

OFAC devotes substantial attention to VSD status, remedial response, cooperation, willfulness, awareness, and sanctions-program harm. Mot. 12, 18–20. The APA required a reasoned explanation of the first-violation decision, not simply substantiation of the culpability

findings. *PAZ Securities*, 494 F.3d at 1064–65. And discretion to weigh aggravating and mitigating factors did not relieve OFAC of its obligation to explain materially different treatment in comparable enforcement matters. *See Friedman v. Sebelius*, 686 F.3d 813, 826–28 (D.C. Cir. 2012) (recognizing discretion over the weight of aggravating and mitigating factors but remanding because the agency failed to explain its departure from prior sanctions decisions). OFAC's defense of its culpability findings still does not reconcile its denial of first-violation credit with the Guidelines' ordinary treatment or the comparator record.

Start with VSD timing. OFAC denied formal VSD treatment because it concluded that the FBI learned of the payment arrangement before Gracetown's January 2022 disclosure. AR 16 & n.43; *see* Mot. 8–9 & n.4. Assuming *arguendo* that determination was correct, it does not explain why Gracetown's acknowledged first-violation status warranted no reduction from the resulting base penalty. The Guidelines expressly distinguish VSD from non-VSD cases when selecting the base penalty and prescribing cooperation reductions, but impose no VSD condition on first-violation eligibility. 31 C.F.R. pt. 501, app. A §§ V.B.2.a, V.B.2.b.i–ii.

The disclosure's relevance to mitigation likewise does not depend on its qualification for formal VSD treatment. General Factor G expressly considers whether the subject supplied relevant information "whether or not voluntarily self-disclosed." *Id.* § III.G.2. OFAC itself recognized that distinction: It denied formal VSD treatment but increased cooperation mitigation from 10% to 20%. AR 16–17. OFAC invokes that reduction to defend its overall calculation. Mot. 18–20, 28. But neither the cooperation credit nor OFAC's adverse assessment of any remedial response supplies an explanation for giving Gracetown's acknowledged first-violation history no mitigating weight whatsoever. OFAC was obligated to reasonably explain why that history counted as mitigating in the record enforcement matters, but warranted no reduction here. *See Friedman*, 686

F.3d at 826–28. It failed to do so.

OFAC must explain the denial of first-violation mitigation, not merely defend its findings about the seriousness of the conduct. The Guidelines separately address selection of the base penalty and its adjustment for first-violation status. 31 C.F.R. pt. 501, app. A §§ V.B.2.a, V.B.2.b.ii. OFAC nevertheless characterizes Count I as "disagreement with the weight OFAC gave to certain relevant factors," Mot. 18, and defends its willfulness or recklessness finding by invoking the Notification, Gracetown's ownership and personnel, and the settlement arrangement. Mot. 19. But those circumstances had already informed OFAC's egregiousness determination and selection of a statutory-maximum base. AR 13–15, 38–39. Simply repeating them does not adequately explain why Gracetown's acknowledged first-violation history warranted no reduction. *See PAZ Securities*, 494 F.3d at 1064–65.

The penalty's scale underscores the consequence of that inadequately explained adjustment: OFAC imposed a $7,139,305 penalty for payments totaling $31,250. AR 18, 37. OFAC states it considered transaction value but found it outweighed by other factors, including the prolonged continuation of the payments after the Notification. Mot. 12 (citing AR 15). While that addresses OFAC's assessment of the conduct's gravity, it does not reconcile the denial of first-violation mitigation with OFAC's treatment of the same formal enforcement history as mitigating in the record matters. AR 17, 879, 884, 889, 911. The separate $71,094 RPPR component does not cure the URSR defect, and Gracetown does not challenge it under Count I. OFAC explained that the blocked-property report was more than forty-five months late and that the reporting obligation applied regardless of Gracetown's sophistication. AR 18; Mot. 13. An adequate explanation for that component does not supply the missing explanation for the larger URSR component, calculated under separate Guidelines provisions.

Finally, Count I does not depend on speculation that the September 2022 Deripaska Indictment influenced OFAC. Mot. 20–21. The Complaint pleaded the point conditionally, Compl. ¶ 61(k), and Gracetown need not pursue the point for Count I. Either way, the first-violation and comparator defects stand or fall on OFAC's own stated reasoning.

### C. The Explanatory Defect Was Prejudicial and Requires Vacatur and Remand

Under *Karpova*, an error is prejudicial where there is "a significant chance that but for the error, the agency might have reached a different result." 497 F.3d at 269 (quotation omitted). That standard is met because the defect concerned the discretionary adjustment that fixed the amount. OFAC awarded no first-violation reduction from the $8,835,264 URSR base, although that consideration could have reduced the base by as much as $2,208,816, and nothing in OFAC's contemporaneous record establishes that OFAC necessarily would impose the same amount after a reasoned treatment of first-violation status and the record comparators. This is like *Epsilon Electronics* on appeal, where the D.C. Circuit had "substantial doubt" OFAC would have imposed the same penalty once one component of its reasoning fell away, held the segments of the calculation "intertwined," and declined to "speculate as to what penalty amount it would set under a different balance of aggravating and mitigating factors." 857 F.3d at 929–30. It remanded the penalty calculation in its entirety. *Id.*

The Court should not choose a reduction or reconstruct the penalty calculation; that discretionary judgment belongs to OFAC in the first instance. *Camp*, 411 U.S. at 143; *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001). Remand would require OFAC to address the identified defects. The Court should therefore deny OFAC's motion on Count I, grant Gracetown's cross-motion, vacate the Penalty Notice, and remand for reconsideration.

## II. GRACETOWN PLAUSIBLY ALLEGED THAT OFAC'S $7.1 MILLION

**PENALTY VIOLATES THE EXCESSIVE FINES CLAUSE**

Count I explains why OFAC failed to adequately explain the amount of its penalty under the APA. Count IV argues that, even accepting OFAC's liability findings in full, the Complaint plausibly alleges the amount is grossly disproportional to the gravity of the violations.[4]

OFAC treated twenty-three $1,250 payments and one $2,500 payment, totaling $31,250, as twenty-four separate URSR violations. Because IEEPA's fixed-amount maximum of $368,136 exceeded twice the value of every payment, each violation carried the same ceiling. After OFAC's 20% reduction, the URSR component was $7,068,211—equivalent to per-installment penalties of about 236 times each $1,250 payment and 118 times the $2,500 payment. Compl. ¶ 67(a); *id.* Ex. 6, tbl. 1 & Ex. 7 at 2, 6–7.[5] Those violation-specific disparities, measured against the conduct and harm alleged, make gross disproportionality plausible and adequately pled.

**A. The Violation-Specific Allegations Make Gross Disproportionality Plausible**

A civil exaction is a "fine" when it serves punishment at least in part, *Austin v. United States*, 509 U.S. 602, 609–10, 621–22 (1993), and a fine is unconstitutional if it is "grossly disproportional" to the offense's gravity. *United States v. Bajakajian*, 524 U.S. 321, 334, 336–37 (1998). The Second Circuit weighs four factors to determine disproportionality: the essence of the offense and its relation to other unlawful activity, whether the defendant belongs to the class the law principally targets, the maximum authorized fine, and the harm caused. *United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016). Although the inquiry may be demanding, no factor is a

---

[4] Unlike Count I, Counts II through V apply the ordinary motion-to-dismiss standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[5] The separate $71,094 RPPR component brings the final penalty to $7,139,305; because the challenged disparity arises from the URSR calculation, the analysis focuses on that component.

categorical safe harbor. *See id.*; *Bajakajian*, 524 U.S. at 337–40.[6] Here, the essence-of-the-offense, harm, and statutory-maximum factors favor Gracetown—contrary to OFAC's position that every factor favors constitutionality. Mot. 29–30.

***The essence-of-the-offense factor favors Gracetown***. The Complaint alleges twenty-four small, scheduled installments under a 2013 arrangement formed years before Deripaska's designation, used for domestic property expenses, with no onward transfer to Deripaska or Baufinanz, and identifies no separate export, money-laundering, structuring, false-document, or sanctions-evasion scheme as a charged violation. Compl. ¶¶ 23–29, 42, 67(b); *id.* Ex. 6 at 6 & Ex. 7 at 1, 3. OFAC does not seriously dispute that this was an administrative oversight. These allegations situate the conduct well away from the aggravated end of sanctions violations. And while OFAC decided that Gracetown acted willfully or recklessly because it continued receiving payments after the April 2018 Notification and knew of Deripaska's relationship to Baufinanz, Compl. Ex. 7 at 2–3, OFAC's own finding may bear on culpability, but it does not by itself establish the gravity of the offense.

***The harm factor likewise favors Gracetown***. The Complaint alleges that the $31,250 remained in the United States, was used for domestic property expenses, and was never transferred onward to Deripaska or Baufinanz. Compl. ¶ 67(b). Those allegations plausibly limit the conduct's direct consequences. OFAC found that Gracetown dealt in blocked property, satisfied the payer's obligation to Baufinanz, and accrued a corresponding debt. *Id.* Ex. 7 at 4; *see* Mot. 30. The relevant question is not whether the violations caused some harm, but whether that harm makes the mathematical equivalent of $294,509 for each installment proportionate as a matter of law. At the

---

[6] OFAC's penalty qualifies as a fine because it is not restitution or compensation, and its amount turns on egregiousness, willfulness, cooperation, deterrence, and future compliance. Compl. ¶ 59 & Ex. 6 at 4–7, Ex. 7 at 3, 6–7. OFAC does not argue otherwise. *See* Mot. 27–30.

pleading stage, the Complaint plausibly alleges that it does not.

***The statutory-maximum factor also favors Gracetown***. Here the fixed-amount branch supplied a $368,136 ceiling for every payment because it exceeded twice that payment's value. 50 U.S.C. § 1705(b); 28 U.S.C. § 2461 note. The uniform 20% reduction left an effective penalty of approximately $294,509 for both a $1,250 and a $2,500 payment—approximately 118 to 236 times the value of each installment. Assessing 80% of that ceiling for the limited conduct and harm alleged supports gross disproportionality. As the Second Circuit explains, a "statutory maximum . . . does not necessarily reflect an individual offender's culpability or the gravity of the actual offense giving rise to forfeiture." *von Hofe v. United States*, 492 F.3d 175, 187 (2d Cir. 2007).

The $7,068,211 URSR component is 20% below the $8,835,264 aggregate maximum. Compl. Ex. 6 at 4–5 & tbl. 1; *id.* Ex. 7 at 6–7. OFAC invokes *Schwarzbaum*'s "particularly strong" presumption for below-maximum penalties. Mot. 29 (quoting *United States v. Schwarzbaum*, 127 F.4th 259, 284 (11th Cir. 2025)). But that presumption is not conclusive; *Schwarzbaum* itself required a further reduction of an already-discounted aggregate judgment to eliminate the small-account penalties. 127 F.4th at 277–85 (holding fixed $100,000 penalties excessive for an account never exceeding $16,000 while upholding penalties for far larger accounts). Staying below the cap therefore does not defeat the plausible inference that the penalty is grossly disproportional to each *violation*'s gravity. *Schwarzbaum* confirms penalties calculated from fixed statutory maxima remain subject to violation-specific proportionality review.[7]

---

[7] Nor does OFAC's analogy to the criminal Sentencing Guidelines resolve Count IV. Mot. 29–30. *Viloski* treated the applicable Guidelines penalties as evidence of culpability within the full proportionality inquiry, not as a substitute for it. 814 F.3d at 114. Even assuming OFAC correctly applied its Guidelines, its calculation left the same effective $294,509 penalty for each installment, irrespective of its value. Compl. Ex. 6, tbl. 1 & Ex. 7 at 2, 6–7. That calculation does not establish proportionality as a matter of law given the conduct and harm alleged.

***Only the regulated-class factor favors OFAC***.[8] But that single factor does not outweigh the violation-specific allegations above. *Bajakajian* illustrates the inquiry. It invalidated forfeiture of $357,144 where the money was lawful, the offense was a reporting violation unrelated to other illegal activity, and harm to the United States was minimal. 524 U.S. at 337–40. *Bajakajian* rejects the premise that statutory authorization or culpability alone resolves proportionality; the Court must examine the offense actually committed, related misconduct, and harm. Measured by that framework and the violation-specific mechanics, the Complaint states a plausible claim.[9]

**B. OFAC's Authority Does Not Foreclose Count IV**

OFAC invokes *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002), and *Combat Veterans for Congress Political Action Committee v. Federal Election Commission*, 983 F. Supp. 2d 1, 18–19 (D.D.C. 2013), to argue that a fixed statutory penalty avoids *Bajakajian*'s concern with an "indefinite and unlimited" forfeiture. Mot. 28 n.10. But fixedness and proportionality are different questions. Count IV does not challenge an indefinite ceiling; it challenges a fixed ceiling as applied to each $1,250 or $2,500 installment. A numerical ceiling resolves the former concern.

---

[8] Gracetown concedes the class-of-persons factor. 31 C.F.R. § 589.201(a)(3)–(4).

[9] Unsurprisingly, courts across the country routinely hold civil penalties constitutionally excessive at ratios to actual damages or the funds involved well below the more-than-228-to-1 ratio for the total penalty here. *See, e.g.*, *Schwarzbaum*, 127 F.4th at 277–78 (rejecting annual penalties as excessive at ratios of approximately 8:1, 9:1, and 10:1 to the account's reporting-date balances); *United States ex rel. Grant v. Zorn*, 107 F.4th 782, 798–800 (8th Cir. 2024) (rejecting a combined award of treble damages and civil penalties as excessive at a ratio of 78:1 to actual damages); *United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*, 2025 WL 624493, at *7–8 (N.D. Tex. Feb. 26, 2025) (rejecting minimum statutory penalties as excessive at a ratio of approximately 109:1 to actual damages); *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, 715 F. Supp. 3d 1133, 1157–58, 1164–65 (D. Minn. 2024) (rejecting statutory civil penalties as excessive at a ratio of approximately 8:1 to actual damages); *United States ex rel. Smith v. Gilbert Realty Co.*, 840 F. Supp. 71, 74–75 (E.D. Mich. 1993) (rejecting a civil penalty as excessive at a ratio of approximately 178:1 to actual damages).

It does not make every assessment below that ceiling proportionate, as *Schwarzbaum* confirms.

OFAC's other cases are likewise distinguishable. *See* Mot. 30. In *Epsilon Electronics*, OFAC's approximately $4.07 million penalty arose from more than $3.4 million in Iran-linked shipments over four years—about 1.2 times the underlying value and roughly one-third of the statutory maximum. 168 F. Supp. 3d at 137–38, 144–45. Here, the violation-specific ratios range from 118:1 to 236:1. The D.C. Circuit later vacated several liability findings and remanded the entire penalty calculation without reaching the Eighth Amendment issue. *Epsilon Electronics*, 857 F.3d at 929–30. That district-court decision shows only that transaction-count methodology may be constitutional on materially different facts; it does not foreclose this as-applied claim.

Farther afield is *Sanders v. Szubin*, 828 F. Supp. 2d 542 (E.D.N.Y. 2011). *See* Mot. 30. It upheld a $9,000 penalty for willfully refusing an OFAC information request after express warnings. 828 F. Supp. 2d at 552–54. That decision confirms that interference with sanctions administration may cause harm beyond a transaction's dollar value—a proposition Gracetown accepts. It does not resolve whether a multimillion-dollar fixed-maximum penalty applied separately to twenty-four small installments is grossly disproportional on the allegations here.

Ultimately, Count IV does not challenge IEEPA's per-violation structure, collapse the payments into one violation, treat transaction value as the exclusive measure of harm, or seek a substitute penalty. It alleges only that this penalty is grossly disproportional as applied to these installments and this conduct. That claim is plausible, and the Court should deny dismissal.

## III. GRACETOWN PLAUSIBLY ALLEGED OFAC IMPOSED THE $7.1 MILLION PENALTY WITHOUT CONSTITUTIONALLY ADEQUATE PROCESS

Counts I and IV concern the amount OFAC imposed; Count II concerns the process that produced it. OFAC argues that Congress required ALJ hearings under the Trading with the Enemy Act ("TWEA") but not IEEPA, and that the existing IEEPA procedures satisfy due process. Mot.

21–25. Statutory entitlement and constitutional adequacy are distinct questions, as this Court has recognized. *See Darko v. Sessions*, 342 F. Supp. 3d 429, 434–36 (S.D.N.Y. 2018) (Ramos, J.) (requiring a new immigration bond hearing with the burden on the Government as a matter of due process although the statute imposed no such requirement). Gracetown need not defeat OFAC's broad theory because, even assuming no statutory ALJ right or cross-program parity, the Complaint alleges a narrower as-applied claim: After extensive paper process, OFAC imposed a final $7,139,305 penalty without any mechanism to present and test testimony concerning person-specific findings of knowledge and authority that OFAC attributed to Gracetown.

Count II plausibly pleads that theory. It alleges that the URSR process supplied no mechanism to present evidence in a formal setting and thus denied a meaningful opportunity to be heard, Compl. ¶ 63(b), and challenges the procedure used to impose this penalty, *id.* ¶ 63(d). The incorporated allegations dispute what Gracetown's personnel understood from the April 2018 Notification, the property manager's knowledge of the 2013 arrangement, and Ezubov's recollection and involvement in day-to-day operations. *Id.* ¶¶ 26–29, 31, 47–50; *id.* Ex. 7 at 2–4. Whatever process Gracetown received, it included no mechanism to test personal accounts through questioning—and, as the *Mathews* balance below shows, that omission is dispositive for the person-specific findings that drove the character and amount of this penalty.

Due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (quotation omitted). The Court balances the private interest, risk of error and probable value of additional safeguards, and the governmental interest and burden. *Id.* at 335; *see* Mot. 23–24. All factors confirm the same plausible defect: OFAC resolved person-specific findings on a paper record with no testing mechanism. *Goldberg v. Kelly,* 397 U.S. 254, 269–70 (1970) (requiring oral presentation and cross-examination of

adverse witnesses before termination of welfare benefits); *Atterbury v. U.S. Marshals Serv.*, 941 F.3d 56, 64 (2d Cir. 2019) (requiring "some form of hearing" to the extent facts underlying court security officers' removal were disputed).

Begin with the first factor. OFAC concedes private interest grows with the penalty amount. Mot. 24. OFAC here imposed a final $7,139,305 assessment on an entity that had ceased operations, with no employees or revenue, and virtually no capital or assets. Compl. ¶¶ 21, 57 & Ex. 7 at 7. The magnitude and finality of that assessment make the private interest substantial, strongly favoring Gracetown. *See Goldberg*, 397 U.S. at 263–64 (holding that the extent of procedural protection depends in part on the severity of the threatened deprivation).

The second factor does most of the work, despite OFAC's assertion that "the risk of erroneous deprivation is low." Mot. 24. OFAC used paper-record inferences about knowledge and organizational responsibility to find willfulness and egregiousness, select the statutory-maximum URSR base, distinguish other matters, and deny first-violation mitigation. Compl. Ex. 6 at 1, 4–5; *id.* Ex. 7 at 2–6. Those determinations did not turn on arithmetic or standardized reports. *See Hauschild v. U.S. Marshals Serv.*, 2018 WL 3014095, at *12 (S.D.N.Y. June 15, 2018) (finding greater potential value in oral testimony where witness credibility and reliability were at issue), *aff'd sub nom.*, *Atterbury*, 941 F.3d at 64.

Consider a few concrete examples of how even limited questioning could have reduced the risk of error. OFAC concluded that the property manager received the McCarthy agreement in 2013, but no evidence resolved what the manager remembered four years later when Deripaska was sanctioned in 2018, what was communicated after the Notification, or why the payments continued. Compl. Ex. 7 at 3–4. OFAC also assumed that Ezubov was authorized to speak for both entities and that Gracetown operated "exclusively within Deripaska's network," *Id.* at 3, 6—but

OFAC concedes that Deripaska gave up his ownership of Gracetown before he was sanctioned, the OFAC's nebulous findings about Deripaska's continuing 'network' remain untested and unexamined. A hearing on these issues certainly would have tested this 'network' characterization attributed to Gracetown, but no procedure allowed the relevant individuals to be questioned before OFAC made final findings about what each purportedly knew, understood, and communicated. Compl. ¶¶ 58–59, 63(b), (d). Because those findings drove millions in penalty exposure, the alleged value is concrete. *See Mathews,* 424 U.S. at 335.[10]

The third factor does not offset this harm merely because OFAC asserts that ALJ litigation might impose a "very high" administrative cost. Mot. 24. OFAC's general interest in administering sanctions does not answer whether a testimonial mechanism was warranted for this retrospective penalty investigation, conducted over years and involving person-specific facts—not an emergency designation or asset freeze where advance process could facilitate asset flight. Compl. ¶¶ 33, 36, 38–42, 57. And although TWEA's hearing provision does not set the constitutional minimum, it confirms evidentiary adjudication of sanctions penalties is not institutionally foreign to Treasury. 50 U.S.C. § 4315(b)(3); 5 U.S.C. §§ 554–557. At this stage, the balance of the three factors makes Gracetown's claim plausible.

OFAC's reliance on written submissions and later judicial review does not alter that balance. *See* Mot. 24–25. *Interior Glass Sys., Inc. v. United States* involved an objective

[10] Bencivenga's designation to receive notices for Baufinanz does not establish employment by Baufinanz: Gracetown described her receiving Gracetown's mail, depositing its checks, and coordinating with its outside accountant. Compl. Ex. 9 at 4–5. Her acknowledgment of the agreement in 2013 and statement in 2020 that she did not know the arrangement present a concrete question for follow-up examination, not merely a request to repeat the written submissions. Compl. Ex. 7 at 3–4. The oversight resulted from the payments' small, routine nature, *id.* ¶¶ 24, 26–29, 31, and questioning could have tested that explanation, her recollection, and her response to the 2018 Notification. Nor does the "network" label resolve ownership: Deripaska no longer owned Gracetown and did not own the managed properties when the Notification issued. *Id.* ¶¶ 26–27.

comparison requiring no credibility determination, little probable value from a face-to-face meeting, and an opportunity for precollection administrative review. 927 F.3d 1081, 1086–87 (9th Cir. 2019). Here, the decisive findings turned on disputed inferences about what particular people knew, understood, and communicated. *United States v. Cap. Tax Corp.* involved a non-self-enforcing EPA cleanup order; no penalty would be imposed unless EPA sued and a court determined liability and the amount of any penalty. 2007 WL 488084, at *3–5 (N.D. Ill. Feb. 8, 2007). Here, OFAC itself determined the violations and imposed the final penalty; the ensuing APA action reviews that completed agency adjudication rather than furnishing the first enforceable determination of liability and penalty. *Cf. FERC v. Maxim Power Corp.*, 196 F. Supp. 3d 181, 194–97 (D. Mass. 2016) (applying *Mathews* to require ordinary civil proceedings on statutory de novo review of civil penalties where respondents could submit written evidence but could not depose or present witnesses).

Separately, *Karpova* (which OFAC does not invoke against Count II) found written submissions sufficient because the decisionmakers had the claimant's legal arguments, did not act on a one-sided or incomplete record, and the claimant identified no testimonial benefit. 497 F.3d at 270–71. In contrast, Gracetown identifies the people to be questioned, the disputed inferences that questioning could test, and how those inferences drove the penalty.[11] *Epsilon Electronics* found no prejudice because the company already possessed, and could have submitted, the

---

[11] OFAC's remaining authorities, Mot. 23, 25 & n.8, address propositions Gracetown does not dispute. *Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 71 n.7 (D.D.C. 2008) (rejecting a statutory entitlement to an ALJ hearing absent an on-the-record hearing requirement); *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59, 70 (D.D.C. 2009) (same); *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151–52 (D.C. Cir. 2010) (confirming APA review where IEEPA specifies no forum). Count II claims neither a statutory right to an ALJ nor identical procedures across sanctions programs. It alleges procedures used to impose *this* penalty were constitutionally inadequate under *Mathews*.

evidence it said it would have offered. 857 F.3d at 931. Here, the missing safeguard was not notice of documentary evidence, but a mechanism to test person-specific inferences through questioning, and Gracetown identifies the findings that mechanism could have tested and how those findings drove the penalty. Each of these decisions rests on a safeguard or factual premise absent here; none forecloses Gracetown's as-applied claim that, under *Mathews*, limited questioning was required before OFAC made the person-specific findings that drove this penalty.

Ultimately, although OFAC defends the absence of ALJ adjudication, *see* Mot. 22–25, Count II does not ask the Court to prescribe a particular hearing now. Instead, it alleges OFAC resolved penalty-driving questions of knowledge and authority, and imposed a multimillion-dollar obligation, without any mechanism through which personal accounts could be tested. Under *Mathews*, that concrete as-applied allegation is plausible and the Court should deny dismissal.

## IV. GRACETOWN PLAUSIBLY ALLEGED THAT NATIONAL ORIGIN PLAYED AN IMPERMISSIBLE ROLE IN OFAC'S FIRST-VIOLATION DECISION

OFAC recasts Count III as resting only on speculation about Gracetown's former and current Russian ownership. Mot. 25. Not so. OFAC acknowledged Gracetown had no prior Penalty Notice or Finding of Violation, yet gave that history no mitigating effect, and its own PPN justified that decision with nationality-specific language. Compl. ¶¶ 52–56, 65(a)–(c); *id.* Ex. 6 at 6. OFAC says that Deripaska's designation, the Notification, and Baufinanz's ownership explain OFAC's decisions for reasons unrelated to nationality. Mot. 25–26. Maybe so, but the question at this stage is whether the pleadings plausibly support the inference that national origin *also* played a role.

That inference is subject to a demanding standard, but not an impossible one. The Fifth Amendment prohibits unjustifiable national-origin discrimination by the Federal Government. *See Schneider v. Rusk*, 377 U.S. 163, 168 (1964). To state this claim at this stage, Gracetown must plead facts supporting action taken "because of" the protected characteristic, *Iqbal*, 556 U.S. at

676–77, and "because of" does not require that national origin be the sole reason for OFAC's denial of first-violation mitigation. Discriminatory purpose may be inferred from circumstantial evidence and may coexist with lawful considerations. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977). Applying *Iqbal*, *Banco San Juan Internacional, Inc. v. Federal Rsrv. Bank of New York* held that disproportionate account closures affecting Venezuelan-owned banks, supported only by a news report identifying neutral sanctions and money-laundering concerns, did not plausibly establish discriminatory purpose. 176 F.4th 163, 188–89 (2d Cir. 2026).

Here, OFAC's nationality-specific language, coupled with the well-pleaded differing treatment of other cases with the same enforcement history, supplies the "additional evidence of discriminatory animus" lacking in *Banco San Juan*. *Id.* at 189. After acknowledging that Gracetown qualified for first-violation consideration because it had received no Penalty Notice or Finding of Violation in the preceding five years, OFAC explained its denial by stating that Gracetown "was formerly owned by a now-designated Russian oligarch" and existed to manage properties purchased by "the same oligarch." Compl. Ex. 6 at 6. OFAC then invoked alleged Deripaska-network ties and concluded that Gracetown's sanctions history was neither mitigating nor aggravating. *Id.* OFAC chose nationality-specific language in the plaintiff-specific discussion as to why Gracetown's otherwise qualifying enforcement history would receive no mitigating weight. To be sure, this wording alone does not prove discrimination, and Deripaska's designation may have made his ownership and network relevant. *Id.* Ex. 7 at 6. But that relevance does not excuse OFAC's stated reasoning: the PPN is OFAC's own decisional document, and the final notice sustained the same mitigation denial without repudiating the PPN's nationality-specific framing. At this stage, that agency language supplies concrete factual support for an alleged discriminatory purpose.

Nodus and Bank of America corroborate this inference: they show OFAC treating the very consideration at issue here—the absence of a recent Penalty Notice or Finding of Violation—as mitigating in matters involving entities the Complaint alleges were not Russian-affiliated. Compl. ¶ 55 & n.6, ¶ 65(c). OFAC says the comparison fails because Nodus and Bank of America are not similarly situated in all material respects, citing Nodus's qualifying VSD status, Bank of America's remediation, and both entities' lack of a direct OFAC notification. Mot. 26–27 (citing *Davis v. Metro N. Commuter R.R.*, 2022 WL 2223018, at *7 (S.D.N.Y. June 21, 2022)). But Count III does not rely on these matters as standalone comparators establishing an entitlement to parity. It alleges the narrower disparity that OFAC treated the same formal history as mitigating there while assigning it no weight here—a disparity those distinctions do not address. Compl. ¶¶ 55, 65(c) & Ex. 7 at 6. Standing alone, that disparity might not show discriminatory purpose; together with OFAC's nationality-specific fixation, it makes the inference of an additional, unlawful motive plausible. The Court should deny dismissal.

## V. GRACETOWN PLAUSIBLY ALLEGED THAT OFAC'S FINAL PENALTY VIOLATED THE SEVENTH AMENDMENT

Counts I through IV concern the basis, amount, and procedures involved in OFAC's penalty; Count V asks who may finally determine liability. OFAC invokes national-security, foreign-policy, and foreign-commerce interests to place IEEPA penalties within the public-rights exception. Mot. 32–34. But Gracetown has challenged OFAC's authority to adjudicate a punitive monetary liability without a jury, not OFAC's authority to administer sanctions. Compl. ¶ 69.

*SEC v. Jarkesy* supplies a two-step framework. 603 U.S. 109, 120, 127 (2024). First, the Court asks whether the action is legal in nature and therefore implicates the Seventh Amendment, considering its common-law analogue and, more importantly, the remedy sought. *Id.* at 122–23. The first step is satisfied here. Claims for punitive civil penalties are legal in nature. *Tull v. United*

*States*, 481 U.S. 412, 418–22 (1987) (tracing statutory civil-penalty actions to the common-law action in debt, historically tried to juries). And OFAC concedes as much. Mot. 31.

The dispute therefore turns on the second step—whether the public-rights exception nevertheless permits Congress to assign final adjudication to an agency without a jury. *Jarkesy*, 603 U.S. at 127. That inquiry requires "close attention to the basis for each asserted application," not merely identification of the sovereign interests served. *Id.* at 131–32. Here, Gracetown plausibly alleges that OFAC's final adjudication falls outside that exception. OFAC imposed $7,139,305 for blocking and reporting violations to punish, not compensate—the kind of monetary demand historically enforced through an action in debt. Compl. ¶¶ 2, 69(a)–(c). Gracetown is a domestic corporation that received payments under a preexisting commercial arrangement, and the payments came from a U.S. person, remained here, and funded domestic property maintenance. *Id.* ¶¶ 8, 23–29, 46. Baufinanz's ownership by a designated person may explain the sanctions restrictions, *id.* Ex. 7 at 2, but does not itself establish authority for final nonjury adjudication of the resulting punitive claim. *See Jarkesy*, 603 U.S. at 128, 131–32, 135.

OFAC reads *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909), too broadly. Mot. 33–34. *Oceanic* upheld immigration-related fines enforced by withholding vessel clearance. 214 U.S. at 332–35, 343. The Court there relied on Congress's control over admission and its "complete administrative control over the granting or refusal of a clearance," while reserving questions about enforcement methods requiring judicial authority. *Id.* at 343. *Jarkesy* recognized that specific foreign-commerce application, not a general license for agency adjudication whenever Congress regulates. 603 U.S. at 129 & n.1. Here, OFAC's Penalty Notice imposes a freestanding monetary obligation, not conditioned on a sovereign-conferred privilege: payment or installment arrangements are due within thirty days of receipt; nonpayment triggers

interest and charges; and Treasury may pursue administrative collection. Compl. Ex. 7 at 7–8.[12] OFAC's foreign-policy rationale does not establish why *Oceanic*'s authority to enforce conditions on such a privilege extends to this adjudication. *See Jarkesy*, 603 U.S. at 131–32.

OFAC also argues IEEPA creates novel duties rather than common-law obligations and that RPPR liability lacks the elements of fraudulent concealment. Mot. 34–35. *Jarkesy* distinguished, rather than overruled, *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977), which upheld administrative enforcement of novel workplace-safety duties. 603 U.S. at 136–38. But statutory creation or public enforcement does not suffice to remove traditional legal claims from juries. *Id.* at 135, 139–40. *Sligo Creek Ctr. v. HHS*, which OFAC cites to distinguish the RPPR violations from fraudulent concealment, applied *Atlas Roofing* to novel infection-control duties imposed on voluntary Medicare participants, emphasizing both the public-benefits setting and the absence of an injury requirement. Mot. 34–35 (citing 177 F.4th 556, 557, 560–61 (4th Cir. 2026)). Here, liability concerns private commercial payments, not conditions on public funding. Compl. ¶¶ 23–29, 69. Gracetown's analogy is to the historical penalty action in debt, not a tort requiring private injury. *See Tull*, 481 U.S. at 418–22. That analogy warrants consideration under *Jarkesy* notwithstanding the differences between IEEPA violations and fraudulent concealment.

Those allegations plausibly state a claim under 5 U.S.C. § 706(2)(B) that OFAC violated Gracetown's Seventh Amendment right by finally adjudicating punitive monetary liability without a jury. Compl. ¶ 69. The Court should deny the motion to dismiss Count V.

---

[12] These facts make this case notably different from *FCC v. AT&T, Inc.*, 146 S. Ct. 1418 (2026). There, the Court upheld the FCC's nonjury process specifically because its orders did not obligate payment or trigger interest or nonpayment penalties; collection required a trial *de novo* in which the agency's factual findings had no effect. *Id.* at 1428–30.

## **CONCLUSION**

The Court should deny OFAC's motions, grant Gracetown's cross-motion for summary judgment on Count I, vacate the Penalty Notice, and remand to OFAC for reconsideration. Alternatively, Gracetown requests leave to amend any claim the Court finds insufficiently pleaded.

Dated: September 18, 2026

BOIES SCHILLER FLEXNER LLP

By: */s/ Dan G. Boyle*
Dan G. Boyle
2029 Century Park East
Suite 1520
Los Angeles, CA 90067
(213) 995-5732
dboyle@bsfllp.com

Kathleen H. Shannon
1401 New York Ave NW
Washington, DC 20005
(202) 274-1157
kshannon@bsfllp.com

*Counsel for Gracetown, Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules, as extended to a 35-page limit by the Court's order of May 14, 2026, ECF No. 38. As measured by the word processing system used to prepare it, this memorandum contains 11,298 words.